## In re TIDEWATER COAL EXCHANGE.

(Circuit Court of Appeals, Second Circuit. February 20, 1922.)

Nos. 112, 117, 118.

1. **Bankruptcy ⊕70—Tidewater Coal Exchange held "unincorporated company," subject to act.**

The Tidewater Coal Exchange was an unincorporated association formed during the war, at the instance of the Council of National Defense, to expedite the transshipment of coal at tidewater points and the release of coal cars. Its members were tidewater coal shippers and consignees, and included individuals, corporations, and partnerships. It had no constitution, articles of association, or by-laws, no capital stock, made no charge for membership, and collected no fees, but adopted rules and operated under direction of a commissioner and an executive committee, and its expenses were paid by the railroads and government Railroad Administration. *Held*, that it was an "unincorporated company," within the meaning of Bankruptcy Act, § 4b (Comp. St. § 9588), and subject to adjudication as a bankrupt.

2. **Associations ⊕18—Evidence ⊕69—Regularity of proceedings presumed.**

An association being solely a creature of convention between the members, no check exists upon its right to transact its business in such manner as it may agree upon, so long as it does not act illegally or contrary to public policy, and the regularity of the proceedings of officers is presumed, in the absence of a showing to the contrary.

3. **Associations ⊕18—Formal acceptance of resignation of member of managing committee not essential to effectiveness.**

Formal acceptance of the resignation of a member of the executive committee of an association *held* not essential to its effectiveness.

4. **Bankruptcy ⊕61—Adoption by unincorporated company of resolution consenting to adjudication held valid; "act of bankruptcy."**

Where the executive committee of an association, which was the governing body, with authority to make rules, had made no rule as to quorum or proxies, but it was the "usual practice" to permit members not present at meetings to be represented by another member of their firm or corporation, the adoption by unanimous vote of five of the eight members

---

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the committee who were present or so represented of a resolution admitting the inability of the association to pay its debts and consenting to its adjudication as a bankrupt *held* valid and effective as an act of bankruptcy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Act of Bankruptcy.]

**5. Bankruptcy ⬤~88(2)—Permitting creditor to intervene and answer petition after five days discretionary.**

Under Bankruptcy Act, § 18b (Comp. St. § 9602), the right of a creditor to answer an involuntary petition ceases on the expiration of five days from return day, and denial of a motion by a creditor for leave to intervene and answer, made two months after return day without sufficient excuse, *held* within the discretion of the court.

Petition to Revise and Appeals from the District Court of the United States for the Southern District of New York.

In the matter of the Tidewater Coal Exchange, bankrupt. The New England Coal & Coke Company, the Delaware Steamship & Commerce Corporation, and the Achibald McNeil & Sons Company, Inc., appeal from and petition to revise different orders of the District Court. Affirmed.

For opinions below, see 274 Fed. 1008, 1011. See, also, 280 Fed. 648. Certiorari denied Delaware Steamship & Commerce Corporation v. New England Coal & Coke Co., 257 U. S. ——, 42 Sup. Ct. 587, 66 L. Ed. ——.

James F. Curtis and Root, Clark, Buckner & Howland, all of New York City, for New England Coal & Coke Co., and others.

Peale & McLaughlin and John Caldwell Myers, all of New York City (John W. Davis, of New York City, of counsel), for Archibald McNeil & Sons Co., Inc., and protective committee of shippers of Tidewater Coal Exch.

Nelson B. Cramer, of Cincinnati, Ohio, and T. K. Schmuck, of New York City, for Delaware Steamship & Commerce Corporation.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The New England Coal & Coke Company, which is a Massachusetts corporation, together with two other corporations, alleging themselves to be creditors of the Tidewater Coal Exchange, hereinafter called the Exchange, filed a petition in the District Court for the Southern District of New York on May 12, 1921, in which they asked that the Exchange be adjudged a bankrupt. The claims of the petitioning creditors aggregated $276.687.37. The petition alleged that the Exchange was insolvent, and that while insolvent, and within four months of the filing of the petition, to wit, on May 11, 1921, it committed an act of bankruptcy, in that it admitted in writing its inability to pay its debts and its willingness to be adjudged a bankrupt on that ground.

The Exchange put in an answer, and set up certain facts, hereinafter more fully referred to, and averred that, in view of the facts which it alleged, it was in doubt whether or not it was subject to the provisions of the Bankruptcy Act (Comp. St. §§ 9585–9656).

A "protective committee of shippers of Tidewater Coal Exchange," by Howard Adams, chairman, pursuant to leave of court, intervened and filed an answer, in which they denied that the Exchange was such a person or incorporated company as could be adjudicated a bankrupt under the act. The answer also denied that the Exchange had committed the acts of bankruptcy set forth in the petition, and further stated on information and belief that the Exchange was not insolvent.

The Archibald McNeil & Sons Company, Inc., similarly intervened, and put in a separate, but similar, answer.

The Delaware Steamship & Commerce Corporation asked leave to intervene and answer. Its proposed answer the court, in the exercise of its discretion, declined to receive.

The petitioning creditors afterwards moved to strike out the answer of the protective committee of shippers of the Tidewater Coal Exchange and the amended answer of Archibald McNeil & Sons Company, Inc. The ground upon which this petition was based was that neither the protective committee nor the Archibald McNeil Company was a creditor of the bankrupt, or a person authorized to file an answer under the provisons of the Bankruptcy Act. These motions were denied by order dated August 4, 1921. The petitioning creditors thereupon filed a petition to revise the order denying the motions to strike out the answers above referred to.

The Protective Committee and the Archibald McNeil Company each appealed from the order of July 27, 1921, which adjudicated the Exchange a bankrupt.

The Delaware Steamship & Commerce Corporation also filed a petition for appeal from the order of July 27, 1921, adjudicating the Exchange a bankrupt, and from the order, dated August 4, 1921, denying its motion to intervene and file its answers. It also filed a petition to revise both orders.

On August 12, 1921, the District Court entered an order consolidating the appeals and petitions to revise, and directed that they should be heard on a single record. They were argued in this court together, and they will be disposed of in a single opinion. The case was disposed of by the District Judge upon a stipulation of facts, certain of which will be referred to as we proceed.

[1] The first question we have to consider is whether the Exchange is such a person or company as can be adjudicated a bankrupt within the meaning of the Bankruptcy Act. The District Court concluded that it came within the purview of the act, and accordingly adjudged it a bankrupt. Before proceeding to consider whether the Exchange comes within the terms of the act, it is necessary to refer to the nature of the association and the object which it was created to accomplish and how it came into being. It appears that it was organized at the instance of the Council of National Defense on June 20, 1917, and that it continued in existence until April 30, 1920. It was established to expedite the transshipment of coal at tidewater points and to secure the prompt release of coal cars at the various ports. In November, 1917, under an order of the Fuel Administrator, every shipper of bituminous coal for transshipment at any one of the tidewater ports where the Ex-

change operated was obligated to consign all shipments of coal to the Exchange. These shipments and consignments were to be made in accordance with and subject to the provisions of the existing rules of the Exchange. As a result of this order, shippers of coal were forced to use it in connection with tidewater shipments, although nothing in the Fuel Administrator's order made such an involuntary shipper a member of the Exchange. The Exchange was not incorporated. It had no constitution or articles of association or by-laws. When it was formed certain rules were adopted, and were subsequently revised, and under its rules the Exchange functioned.

The original rules of the Exchange provided that any tidewater coal shipper or consignee could become a member of the Exchange, subject to the approval of the executive committee, provided he subscribed to the agreements covering the handling of coal through the Exchange. The membership of the Exchange included, not only individuals, but corporations and partnerships as well. No member was required to contribute any capital, to pay any initiation fee or suffer any assessments, or to bear or pay any of the expenses of the Exchange. Its operations were conducted at no cost to the members and without any possibility of pecuniary profit. There was no capital involved in this common undertaking, and by arrangement with various railroads all of the operating expenses of the Exchange were borne and paid by the railroads. During the period of government control of railroads, the Director General of Railroads took over and assumed the obligations of the railroads with respect to expenses.

The chief administrative officer of the Exchange was a commissioner. There was also an executive committee, which seems to have had its origin in the executive committee of the tidewater producers, who, with the railroads, co-operated in bringing about the formation of the Exchange. The original rules of the Exchange made no provision for the selection of a commissioner or for the selection or election of an executive committee. The revised rules of the Exchange provided that the executive committee should be elected by the members of the Exchange, but these contained no provision with respect to the election or selection of a commissioner.

We now come to consider whether the Exchange comes within the purview of the Bankruptcy Act. Section 4 of the act (Comp. St. § 9588) enumerates the persons who shall be entitled to the benefits of the act. Subdivision "b" of section 4 declares that—

"Any natural person, except a wage-earner, or a person engaged chiefly in farming or the tillage of the soil, *any unincorporated company*, and any corporation engaged principally in manufacturing, trading, printing, publishing, mining, or mercantile pursuits, * * * may be adjudged an involuntary bankrupt. * * *"

The act in section 4 makes three classes subject to its provisions and liable to be adjudged an involuntary bankrupt: (1) "Any natural person," except such as are engaged in certain enumerated pursuits; (2) "any unincorporated company;" (3) "any corporation" engaged in certain enumerated pursuits. And section 5 (Comp. St. § 9589) provides

280 F.—41

a fourth class and declares that "a partnership" may be adjudged a bankrupt.

The act in its first section defines the meaning of words and phrases used in the act, and there are 30 of such definitions. But nowhere in the act is there to be found any definition of the meaning of the words "unincorporated company." The court must therefore determine their meaning, and in attempting to do so we find little assistance in the cases. In 1904, in Burkhart v. German-American Bank (D. C.) 137 Fed. 958, Judge Thompson, speaking of an "unincorporated company" under section 4b of the act, said:

"It is generally understood to be a body or association occupying middle ground between partnerships and stock corporations, possessing some of the powers and privileges of both, and is generally so recognized by the courts."

In 1905 the District Court for the Southern District of New York in the case of In re Seaboard Fire Underwriters, 137 Fed. 987, held that an unincorporated Lloyd's association of fire underwriters was "an unincorporated company," within the meaning of the act, and as such subject to be adjudicated a bankrupt, although, if it had been incorporated, it could not have been proceeded against, because corporations carrying on the business of insurance were expressly excepted from the provisions of the act. Judge Holt in the above case, referring to section 4b, said:

"Under this provision, in my opinion, any unincorporated company may be adjudged a bankrupt," and "that any unincorporated company engaged in any kind of business may be put into bankruptcy if it is insolvent and has committed an act of bankruptcy."

In 1914 the District Court for the District of Massachusets, in the case of In re Associated Trust, 222 Fed. 1012, held that a trust association, created by an instrument of trust providing that the property acquired should be held and managed by a trustee, but the capital of which was contributed by certificate holders, who had power to elect a trustee in case of a vacancy, each share having one vote, also power to amend the declaration of trust, increase the number of shares, and by a three-fourths vote terminate the trust, was an "unincorporated company" within the meaning of the act. The court thought the words of the act implied—

"an association of individuals, not partners, carrying on business under a distinct name, and having common rights inter se, but having no individual ownership in the joint property, no individual control over the business in which their joint capital is embarked, and no direct individual liability for the company's debts. Its use in connection with the word 'unincorporated' would seem to imply that the organization should have some of the attributes usually found in corporations."

The court thought the words "unincorporated company" exactly described what the respondent was.

In 1917 the Circuit Court of Appeals in the Third Circuit had the meaning of the words "unincorporated company" as used in this act before it in the case of In re Order of Sparta, 242 Fed. 235, 155 C. C. A. 75. The Order of Sparta was an unincorporated fraternal beneficial association. It had no capital stock, and its members were not

liable for its debts or the benefit certificates which it issued to its members; these being payable only out of its treasury. It was not organized for profit, but for the sole benefit of its members and beneficiaries. Its purpose was fraternal or social and beneficial. The court below held it was an unincorporated company within the meaning of the act, and as such might be adjudicated a bankrupt; and this was affirmed. In the course of its opinion the court said:

"Whatever may be the full scope of the word 'company,' it does include at least any unincorporated association or group of individuals whose object and purpose are either wholly or chiefly of the same kind as the object and purpose of a moneyed business, or commercial corporation. A corporation is also a group of individuals, and the fact that one group has a charter, while another group with an identical object has none, hardly furnishes a sufficient reason for exempting the latter from the scope of the act."

A company is defined in the Century Dictionary as "a number of persons united for performing or carrying on anything jointly." If such a number of persons are united for carrying on any kind of business enterprise jointly, and are not incorporated, and do not constitute a partnership, they are an "unincorporated company" within the true intent and meaning of the acts of Congress relating to bankruptcy. We are not now called upon to determine whether a company which is not engaged in carrying on some sort of trade or business enterprise, some commercial or industrial undertaking, is or is not also comprehended by the words; for it is clear that what the Exchange was created to accomplish was clearly a business or commercial enterprise.

If each word in the phrase "any unincorporated company" is given its ordinary and popular meaning, the Exchange is unquestionably included therein; and, considering the phrase as a whole and in the light of the subject-matter of the act, we can see no reason for giving it a restricted meaning which would exclude it. It is not a "corporation," not having been incorporated at the time involved. It is not a partnership, there being no agreement to divide the profit and bear the loss. It is not a joint-stock company, for there is no stock. It is simply an unincorporated company or association engaged in the prosecution of a business enterprise, as distinguished from one which is charitable, or religious, or educational, or social.

It is true the Exchange did no trading. It bought no coal and sold no coal. It was not designed to earn a profit for itself. It was a mere instrumentality or device created to provide for the handling of coal in tidewater ports in such a manner that the coal-laden cars could be unloaded rapidly, and so promptly released for the handling of other coal. It was in effect a clearing house for coal; but a clearing house for coal is as truly a commercial enterprise as is a clearing house for the settling of balances between banks arising from the interchange of checks and drafts. Whether an unincorporated company not organized for a business purpose can be adjudicated a bankrupt under the act is not before us and is not decided. It is sufficient that the Exchange is an association of individuals in pursuit of a common business object, under a control agreed to by all its members, and capable of having debtors and creditors, and which is neither a corporation, nor a partnership, nor a joint-stock company. It is "an unincorporated com-

pany" within the meaning of the act, and as such can be adjudicated a bankrupt.

This makes it necessary to inquire whether at the time of the adjudication it had committed an act of bankruptcy, or was insolvent. The "stipulation of facts," already referred to, among other things stipulated as follows:

"(1) After the filing of the involuntary petition in bankruptcy against the Tidewater Coal Exchange on May 9, 1921 (No. 29,629), and with knowledge that such petition had been filed, the executive committee of the Tidewater Coal Exchange took action, which is reported in a certificate in writing of which the following is a copy:

" 'Admission of Willingness to be Adjudicated a Bankrupt.

" 'At a special meeting of the executive committee of the Tidewater Coal Exchange, an unincorporated company, which meeting was duly called and held according to law and to the by-laws and regulations of the said Exchange, the following resolution was duly adopted by the vote of five members thereof, constituting a quorum, being all of those present.

" 'Resolved, that the Tidewater Coal Exchange, an unincorporated company, the principal place of business of which is at New York City, in the state of New York, do and the same hereby does admit its inability to pay its debts and consents to being adjudged a bankrupt on that ground.

" 'State of New York, County of New York—ss.:

" 'We, the undersigned, Girvan N. Snider, chairman of the executive committee, and Constance I. McCormack, secretary of the executive committee, of the Tidewater Coal Exchange, do hereby certify that the foregoing resolution, admitting the inability of the said Exchange to pay its debts and its willingness to be adjudged a bankrupt on that ground, was duly adopted at a special meeting of the executive committee of the said Exchange duly called according to law and to its by-laws and regulations, which meeting was held at the Grand Central Terminal at New York City, New York, on the 11th day of May, 1921. G. N. Snider, Chairman. Constance I. McCormack, Secretary.' "

The above statement as to the action taken by the executive committee is accompanied by an affidavit, made by the secretary of the executive committee, certifying to the fact that the copy of the resolution was a full, true, and correct copy of the original resolution as adopted.

The Exchange carried on its operations under a set of revised rules adopted by the executive committee on April 24, 1919. The second rule provided that the executive committee should be composed of eleven persons, to be elected by the members of the Exchange, but only nine were ever elected, and one of the nine had resigned, prior to the adoption of the resolution to which reference is hereinafter made. The fourth rule provided that the executive committee should supervise the Exchange, and that it was "to be assisted when necessary" by a committee of railroad officers, to represent and to be appointed by certain specified railroad companies. The seventh rule provided that the executive committee might after due hearing amend the rules. The rules contained nothing as to the number necessary to constitute a quorum, and nothing as to voting by proxy.

[2] An association being solely a creature of convention between the members, no check exists upon its right to transact its business in such manner as it may agree upon, so long as it does not act illegally or contrary to public policy, and the regularity of the proceedings is presumed, in the absence of a showing to the contrary. Coombs v.

Harford, 99 Me. 426, 59 Atl. 529. The chairman and secretary of the executive committee have certified that the resolution, admitting that the Exchange was insolvent and consenting that it be adjudicated a bankrupt, was adopted "by a vote of five members thereof, constituting a quorum." The board never consisted of more than nine members, and as one of these had sent in his written resignation prior to the adoption of the resolution, the board was composed of eight members at the time the above action was taken.

[3] It is said that the resignation of the member who resigned had not been accepted; but it does not appear that after his resignation he ever acted as a member, and the law does not make a formal acceptance of such a resignation essential to its effectiveness. We declared such to be the law, even where the president of a corporation resigned. In re Guanacevi Tunnel Co., 201 Fed. 316, 319, 119 C. C. A. 554. And in an earlier case we held that the resignation of the secretary and treasurer of a corporation took effect upon its delivery to the president and without any acceptance by the board of directors. International Bank of St. Louis v. Faber, 86 Fed. 443, 30 C. C. A. 178. And see Briggs v. Spaulding, 141 U. S. 132, 154, 11 Sup. Ct. 924, 35 L. Ed. 662.

[4] The certificate was accordingly correct in saying that a quorum was present, if true that five of the eight members were present. But it is said that two of the five necessary to constitute the quorum were not present in person, but were represented by proxies. It is true that no rule seems to have been adopted by the executive committee authorizing the use of proxies. It appears, however, that it was the usual practice for a member of the executive committee who could not attend its meetings to send some member of his firm or corporation to attend as his proxy. The record contains the affidavit of the chairman of the executive committee. He states therein that he has acted in that capacity since April 24, 1919; also that since that date he has attended numerous meetings of that committee and is thoroughly familiar with the rules and regulations of the Exchange and the practice of the committee in the transaction of its business and the conduct of its meetings; also that since April 24, 1919, it had been the usual practice, if a member of the executive committee was absent, for some member of his firm or corporation to attend the meeting as his representative or proxy.

There is, of course, some analogy between the executive committee of this Exchange and a board of trustees of a corporation. But the directors of a corporation represent the whole body of stockholders, and no director represents a particular shareholder. The members of the executive committee of this Exchange, however, did not represent the entire membership of the Exchange, but particular districts, or corporations or firms in particular districts. One of the members of the executive committee who was absent represented the Maryland, Somerset & Northern West Virginia coal operators, of which he was the president, and he gave his proxy to a representative of the same corporation, who had represented him at previous meetings of the committee. The other absent member represented the United States Rail-

road Administration, and he gave his proxy to his assistant in the Railroad Administration.

All this is significant, but is not in itself of controlling importance; but in view of the nature of this executive committee and of this unincorporated company, and that this method of voting by proxy had been "the usual practice" since April 24, 1919, we hold that it did not invalidate the business done at the meeting referred to that two of the quorum were present as proxies. And in this connection we are not overlooking the fact that the executive committee was expressly authorized to establish the rules governing the Exchange, and that no restriction was placed upon its power so to do. Its authority in that respect was plenary. In allowing this practice of voting by proxy to become the "usual" practice, its action in that regard is to be regarded as equivalent to the adoption of a formal rule on that subject. It is not necessary to add that, even in the law of corporations, a continued usage permitting voting by proxy establishes the legality of that method of voting as much as an express by-law. Walker v. Johnson, 17 App. (D. C.) 144; Rossing v. State Bank, 181 Iowa, 1013, 165 N. W. 254; Miller v. Eschbach, 43 Md. 1; Holly Springs Bank v. Pinson, 58 Miss. 421, 38 Am. Rep. 330; 23 Am. & Engl. Encyc. of Law, 296.

The court below was in error in holding that the resolution was not validly adopted; but this error worked no harm, inasmuch as the court reached the conclusion that, while the resolution was invalidly adopted, it was validated subsequently by acquiescence after knowledge brought home to the other members of the committee. That there was such acquiescence with knowledge, and that this would constitute ratification, if ratification were needed, is clear, and it is unnecessary to enlarge upon that subject.

The conclusion which we have reached makes it unnecessary to consider the objections raised to the answers which were interposed by the Archibald McNeil & Sons Company, Inc., and by the protective committee. The conclusion that the Exchange was properly adjudged a bankrupt was arrived at both in the court below and in this court, quite regardless of those answers.

[5] The Delaware Steamship & Commerce Corporation on July 20, 1921, moved for leave to intervene and to be permitted to file an answer opposing an adjudication. It alleged that it was a credit member of the Exchange, and entitled to $37,239.90 from the debit members thereof. Section 18, subdivision "b" of the Bankruptcy Act (Comp. St. § 9602) provides that the bankrupt or a creditor may appear and plead to the petition within five days after the return day, or within such further time as the court may allow. The absolute right of a creditor to answer ceases upon the expiration of the five-day period, and thereafter the right to appear and plead is only permissible within the discretion of the District Court. Collier on Bankruptcy (12th Ed.) 470, 471; In re D. F. Herlehy Co. (D. C.) 247 Fed. 369.

The petition in bankruptcy against the Exchange was filed May 12, 1921, and the return day was May 19, 1921. The above motion to intervene was thus made two months after the return day. In its attempt to excuse this delay in applying for leave to intervene, it alleged

that the corporation was not then and had not for some time been actively engaged in business, and that its attorneys and officers had been engaged continuously for months past in investigating, adjusting, and litigating matters of vital importance to the corporation, which matters were of such pressing moment as to require immediate attention.

The motion to intervene was not only made, as has been pointed out, two months after the return day, but it was made almost two weeks after the District Judge had rendered his opinion of July 7, holding that the Exchange was subject to the provisions of the Bankruptcy Act. In the exercise of his discretion the District Court denied the motion to be permitted to intervene, and in doing so said:

"I use my discretion against the applicants, because they allowed a default of nearly two months to run against them without any excuse whatever. I must conclude from their affidavit that they knew of the proceedings all the time and chose to take no action. It is certainly not necessary to do more than allude to the excuse of other pressing business, unless all judicial proceedings are to be delayed at the convenience of the parties or their attorneys. Moreover, there seems good reason not to open a default in this case. If the tangled affairs of this society can be unraveled in bankruptcy and any preference set aside, it is surely in the interests of justice that it should be done."

As the motion, at the time it was made, was one addressed to the discretion of the District Court, in the absence of a manifest abuse of its exercise of that discretion, it is not reviewable in this court; and a review of the record fails to persuade us that the court below was guilty of any abuse of its discretion in refusing permission to intervene and file an answer. It is the policy of the Bankruptcy Act that creditors should proceed promptly, and no sufficient excuse is given to justify such a delay as exists in this case.

The order of August 4, 1921, denying the motion of the Delaware Steamship & Commerce Corporation for leave to intervene and file its answer is affirmed, and its petitions to revise are dismissed.

The appeals of the protective committee of shippers, and that of Archibald McNeil & Sons Company, Inc., are dismissed, as is the petition of the New England Coal & Coke Company, the Seaboard By-Product Coke Company, and Dexter & Carpenter, Inc., to revise the order of August 4, 1921, denying their motion to strike out the answer of the said protective committee of shippers and the amended answer of the Archibald McNeil & Sons Company, Inc.

The order and decree of July 27, 1921, adjudicating the Tidewater Coal Exchange a bankrupt, is affirmed.