### NEW RIVER COLLIERIES CO. v. SNIDER et al.

(Circuit Court of Appeals, Second Circuit. January 2, 1923.)

1. Bankruptcy ☞100(1)—Adjudication of coal exchange held determination settlement was not to be made by separate pools.

An adjudication that a coal exchange operating several separate pools for the handling of coal of the several grades belonging to its members was a bankrupt necessarily implied that the settlements with its members were not to be made only in terms of coal in the separate pools, or by cash settlements only pool by pool, where there were no creditors or debtors of the exchange except its members, since no one could have been a creditor of the exchange in the sense of being entitled to sue upon a general assumpsit if the settlements were to be made only in one of those two methods.

2. Bankruptcy ☞100(1)—Adjudication cannot be collaterally attacked.

A decree of adjudication in bankruptcy cannot be collaterally attacked.

3. Exchanges ☞15—New rules of coal exchange held to commingle accounts in various pools.

The rules of the Tidewater Coal Exchange, as amended after the Armistice, when it was apparent that overdrafts by the members in the various

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

pools were not being made good in coal as required by the old rules, and which changed the rule that the accounts in one pool should have no bearing on the same man's account in another pool by restricting it to cases where members did not neglect to make up existing shortages, implied that when the pools were at an end and the coal on hand disposed of there should be a general hotchpotch settlement of members with the exchange and not a separate settlement for each pool, in view of evidence as to practice under the new rules and of the impossibility of settling pool by pool.

**4. Exchanges ☞4—Contemporaneous construction of exchange rules not contrary to their language is competent.**

Contemporary construction of the rules of a coal exchange by uniform practice thereunder is competent evidence of the meaning of the rules if such practice was not contradictory of their language.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the New River Collieries Company, suing in its own behalf and on behalf of all others similarly situated, against Girvan N. Snider and another, as representatives of the Tidewater Coal Exchange, and others. From a decree dismissing the bill (284 Fed. 287), plaintiff appeals. Affirmed.

The Tidewater Coal Exchange is the same "unincorporated Company" held to have been properly adjudicated a bankrupt in (C. C. A.) 280 Fed. 638, affirming (D. C.) 274 Fed. 1011. See, also, (D. C.) 274 Fed. 1008.

The nature of the Exchange and its business, the occasion for its existence, and the reasons why it was held a concern capable of having creditors and debtors, are sufficiently set forth in the cases above referred to, but especially in 280 Fed. at pages 640, 641, and 643.

The plaintiff was a shipper of coal but not an original member of the Exchange. It claims to have joined the Exchange under governmental compulsion exercised by the Fuel Administrator. But it did after joining deliver coal to "Pool No. 1." Instead of being permitted to use its own coal for its own purposes or to sell the same to its own customers, said coal or some of it was assigned, i. e. delivered for use, to parties not customers of plaintiff, and such deliveries out of Pool 1 have not in all cases been made good by the consignment of other and similar coal to the pool by those who took what they had not put in. It is suggested that the same sort of thing happened with other pools, i. e. in respect of other classes of coal; the arrangement of pools being in accordance with the differing classes and kinds of coal shipped to tidewater.

The object of this suit is to treat the managers of the Exchange as bailees of coal delivered to the several pools and to compel them as trustees to account for such money and property as may be found or decreed to belong to Pool No. 1 in which plaintiff is especially interested, and in short to compel (since plaintiff sues on behalf of itself and all others similarly interested) an adjustment of the affairs of the Exchange pool by pool and to prevent any settlement of accounts by aligning all shippers or Exchange members who had taken out more coal from all pools than they had put into the same as debtors to the Exchange and treating all those who, considering all the pools together, had consigned more than they took out, as creditors.

No other shipper to or member of the Exchange has joined with plaintiff in the prosecution of this suit. The trustee in bankruptcy has been admitted as a party defendant and has practically displaced Messrs. Snider and Howe (chairman and commissioner, respectively, of the Exchange) in the defense of the suit. The Chemical Bank is named as a defendant because it was the depositary of what was known as the Exchange's "liquidation account."

We find that it was the intent of those who formed the Exchange that all

---

who consigned coal to it should get coal back and not be paid in money by the Exchange for what they shipped. If a given shipper consigned a thousand tons and another shipper was permitted to withdraw that particular thousand tons for his own purposes, it was the obligation of the second shipper promptly to put back into the receptacles of the Exchange a thousand tons of the same grade of coal that he had procured. By this means all accounts would be kept in terms of coal and there would be a perfect balance when all the coal was gone.

This suit and the bankruptcy proceeding arose because some shippers failed to make good their engagements and the account could not be made to balance in terms of coal because those who obtained coal they did not ship did not fill with coal the bins they had emptied.

We think it clearly shown that long before the business of the Exchange terminated the existence of this condition was recognized as a fact. It was further seen as probable that the situation so produced would grow more acute, and that these considerations led to a revision of the original rules of the Exchange, to which revision plaintiff must be deemed to have assented and under which all the transactions said to give rise to this suit occurred.

The Exchange rules which we regard as important and controlling in this litigation are set forth in a footnote.[1] It will be seen that New Rule 22 is an

---

[1] Old Rule 9.

"9. The assignment of coal to members shall be authorized by the Exchange and no assignment shall be made in excess of the tonnage which such member or members have in the designated consigning pool.

"No member shall be entitled to any coal from a designated consigning pool when the accounts indicate that the member has overdrawn from that pool, unless due to some extraordinary conditions the commissioner may deem an exception advisable.

"This shall not prevent a member from borrowing coal in the pool from any other member having a credit, but such transactions must be between individual members and authorized by them to the commissioner in writing."

New Rule 22.

"22. The assignment of coal to members shall be authorized by the Exchange and no assignment shall be made in excess of the tonnage which such member or members have in the designated pool, *except at the discretion of the commissioner or deputy commissioner.* No member shall be entitled to any coal from a designated pool when the accounts indicate that the member has overdrawn from that pool, unless due to some extraordinary conditions, the commissioner or deputy commissioner may deem an exception advisable.

"*Debits of any member in any pool shall be made good immediately on demand of the Deputy Commissioner.*"

Old Rule 12.

"12. The account of a member in one designated consigning pool shall not have any bearing on his account in another pool at the same port or other ports. Members, however, shall be permitted to offset overdrafts in one pool with shipments made to the same pool at another port subject to the approval of the commissioner."

New Rule 23.

"23. The account of a member in one designated pool shall not have any bearing on his account in another pool at the same pier or other piers, *unless said member neglects to make up existing shortages.* Members, however, may be permitted to offset overdrafts in one pool with shipments made to the same pool at another pier, subject to the approval of the commissioner."

Old Rule 10.

"10. When difference between the tonnage of coal shipped by a member and the tonnage of coal dumped into vessels for his account exist and the differ-

amendment of original Rule 9, and so is New Rule 23 of original Rule 12, and new Rule 28 of original Rule 10.

Simpson, Thacher & Bartlett, of New York City (Thomas D. Thacher and Louis S. Weiss, both of New York City, of counsel), for appellant.

James F. Curtis and Root, Clark, Buckner & Howland, all of New York City (Chauncey Belknap, of New York City, of counsel), for appellees.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] The necessary implications of our decision in 280 Fed. 638, go far to dispose of this case. We there affirmed the adjudication as bankrupt of the Exchange, and did so on a creditors' petition. The stipulated facts in that litigation showed (and they are not now denied) that owing to the guaranty by the tidewater rail lines of all the Exchange expenses, the only method in or by which the association could incur debts or have debtors was by recognizing as creditors those who had consigned more coal than they got, and as debtors those who had gotten more than they consigned; and it furthermore appeared (and is recognized as true by the joinder as defendant herein of the Chemical Bank) that settlement in cash had resulted in the "Liquidation Account," and such cash was produced by the Exchange drawing drafts on "debit members" as debtors to the Exchange.

In other words, not only could there have been no adjudication, if settlements had taken place only in terms of coal as originally intended, but also if cash settlements had been called for only pool by pool; because no one would have been a creditor of the Exchange in the sense of being entitled to sue upon a general assumpsit, and look to all the assets of the Exchange from whatever source derived as means of judgment satisfaction.

[2] It is true that this plaintiff did not join in the bankruptcy proceedings, but neither did it seek to oppose. The decree of adjudication cannot be collaterally attacked; and whether a suit that assumes and asserts, as does this one, a legal status inconsistent with adjudication can itself be maintained, is a point on which we shall not dwell, but without decision pass to consideration of plaintiff's argument. We

ences cannot be adjusted either by additional shipments or exchanges of coal, the executive committee shall name a price to the commissioner of the Exchange for the tonnage involved, and the commissioner shall authorize such debits or credits as may be necessary to properly adjust the differences."

### New Rule 28.

"28. *In closing accounts*, when differences between the tonnage of coal shipped by a member and the tonnage of coal dumped into vessels for his account exist, and the differences cannot be adjusted either by additional shipments or exchange of coal, the executive committee shall name a price to the commissioner of the Exchange for the tonnage involved, and the commissioner shall authorize such debits or credits as may be necessary to properly adjust the differences, *after settlement has been made by the members affected.*"

note, however, that we have no desire to depart either from the terms of our previous decision or its legitimate implications.

The already prolonged litigation over this war measure of a coal exchange has largely been before Learned Hand, J., who has repeatedly stated his view that in the beginning, in concept the Exchange was no more than a manager of and for a series of co-operative pools, to which pools the members thereof shipped their own coal; all the coal in the pool being collectively owned by the pool members; who accounted to each other in terms of coal. The Exchange was no more than a means of keeping the accounts, so far as settlements were concerned. With this view of the scheme exhibited by the original rules, and of the contemporary practical construction of them we agree.

If the rules, i. e. the structure and purposes of the Exchange, had remained unchanged from the start, it might perhaps be argued that since the account of any member in any given pool "shall not have any bearing on his account in another pool" (Old Rule 12), each pool should be considered like a grain elevator containing the hopelessly commingled property of many, and yet each owner be still entitled to call an aliquot portion of the mass his own and treat it and trace it accordingly. Central, etc., Bank v. McFarlin, 257 Fed. 535, 168 C. C. A. 519.

[3] But we have no such state of facts before us, and so need not discuss the point; for it is undoubted that the rules did change, that plaintiff became bound by the changes, and such changes in our opinion radically modified, indeed revolutionized, the Exchange concept or plan as far as liquidation or settlement was or is concerned.

As Judge Hand has said (274 Fed. at 1010), "The relations between the members are one thing and means of winding up the joint venture another," but we go further and hold that the proven and indeed admitted means of winding up were intended to and did change the relations between the members quoad winding up.

This is matter of fact, in the sense that we read the new rules and interpret them as meaning what other evidence shows they were meant to mean; such evidence being not contradictory of the rule language.

The Exchange operated under its original rules until some months after the Armistice; active war was past, and a condition existed that required remedy. To open and close pools in terms of coal was possible only if all consignors had plenty of coal, and were solvent and honest. But coal overdrafts had arisen by the acts or with the permission of commissioners appointed by the Exchange (Rule 9), who by its new form (Rule 22) were given authority to demand that the debits thereby created should be "made good immediately"; this meant made good in coal. But plainly if it were to continue true that accounts in one pool should have "no bearing" on the same man's account in another pool (Rule 12), any man could refuse to comply with the commissioner's demand unless he would profit by compliance; therefore the amended rule (23) restricted the "no bearing" aforesaid to cases where members did not "neglect to make up existing shortages." That is, if a consignee made up his shortages and all of them, the various pools had no bearing on each other, which was, of course, true rule or

no. rule; but if he neglected so to do, then a view or an averaging of all his pool ventures was not only permitted but enjoined. It was always contemplated that ultimate differences should be settled in money under guidance of the commissioner (Rule 10); but when the new code looked forward to the closing of the Exchange, Rule 28 stated it as obligatory "in closing accounts" to settle in money when settlement in coal could not be obtained.

While we cannot read these new rules as meaning anything else than that when pools were at an end, and the coal on hand was disposed of, there should be a general "hotchpotch" settlement with the Exchange, the argument can be and is made that they mean no more than that the Exchange should act as a collection agent for each pool, and collect money for the members of such separate pool.

[4] Such a construction finds no support in the testimony; contemporary construction is always potent evidence of meaning, and the Exchange minutes show the practice was uniformly to consider every consignor's total of consignments and withdrawals in all pools, and collect in money. The exception to admission of these minutes is without merit; they show what the very men who made the new rules did by way of practically interpreting them.

Judge Hand in the court below has carefully considered the argument that plaintiff's scheme of settling pool by pool is unworkable. We agree with him in so declaring it; it follows that if another and practical scheme is fairly to be found in the rules, an intent to devise something impracticable is not to be imputed.

Decree affirmed, with costs.