## IRVING TRUST CO. v. MANUFACTURERS' TRUST CO., et al.

### In re JOHN CONNORS, Inc.

District Court, S. D. New York.

Jan. 18, 1934.

Charles Seligson, of New York City, for plaintiff.

Newman & Bisco, of New York City (Henry Landau, of New York City, of counsel), for defendant Manufacturers' Trust Co.

Isidore H. Levey, of New York City (Jacob Landy, of New York City, of counsel), for defendants Jacob, Elsie, and Max Segal.

CAFFEY, District Judge.

It is without dispute that everything with which we are here really concerned, arising under anything involved in the pleadings, occurred within four months prior to the filing of the bankruptcy petition. The issues raised by the nine causes of action are too numerous for me to take up in detail. I do not find it necessary to dispose of them all. On the contrary, I shall confine myself to what seem to me to be the issues which it is essential to pass on in order, as I conceive it, fairly to do justice between the parties. In other words, I shall go to the heart of the controversy. I shall, for convenience, use only round figures.

The issue which has been most controverted and most argued is whether or not the bankrupt was insolvent at the relevant times.

The evidence makes it perfectly clear that there was no substantial change in the financial condition of the corporation between February 19 and March 17, 1932. There was no substantial change either in assets or in liabilities. Such changes as occurred were insignificant, and were so small that they may be ignored for the purpose of ascertaining whether or not the corporation was insolvent. If it was insolvent on March 17, it was insolvent on February 19 and at all times intervening.

As I have said, I shall refer only to round figures. It is plainly established that the debts of the corporation were $35,000. Of

those debts $19,000 were secured and $16,000 were unsecured. Were the assets, the aggregate of the property of the corporation, at a fair valuation less than $35,000? That is the question.

There have been a good many efforts to state the meaning of "fair valuation," as employed in the bankruptcy statute (11 USCA § 1(15). The Grandison Case, 231 F. 800, 804, was decided by the Circuit Court of Appeals for the Second Circuit, and governs me. There Judge Rogers laid down the rule that "the fair cash value or the fair market value of the property as between one who wants to purchase and one who wants to sell the property" is the true definition. Dealing particularly with the valuation of choses in action, there have been other definitions; but they come down to the same thing. In the Segen Case (D. C.) 196 F. 903, 905, for example, which concerned accounts receivable of an installment house, the court said that the valuation should be "such as would be available to the bankrupt himself with which to meet his liabilities within a reasonable time." The term is further clarified in the Coddington Case (D. C.) 118 F. 281, 282, where the court says of the value of book accounts that it is not what "could be realized out of them in time by patient and persistent effort," but rather, "It is their value now that is to be taken."

Having in mind those announcements of the courts as to the tests to be applied, let us examine the figures that have been brought out in the evidence.

First, what was realized in the bankruptcy proceeding? The tangibles sold for $2,635, and the intangibles, which are the accounts receivable, for $2,934, making a total of $5,569; in round figures, let us say $6,000. This was all that was available to pay $16,000. Manifestly, therefore, if realization in the bankruptcy proceeding were a test, there was gross insolvency.

Undoubtedly what was realized in the bankruptcy proceeding is a pertinent fact to be considered. The witnesses testified as to how they arrived at their figures and how the sales were made. According to the appraisers, the maximum to which value of the tangibles could be raised is $4,000. After the bankruptcy, by his conduct Mr. Jacob Segal himself put a valuation on the intangibles as a whole; that is to say, on the unassigned accounts receivable plus the equity in the assigned accounts receivable. He refused to give as much as $7,000 for them. He tells us that he brought on the bankruptcy for the purpose of paying the creditors 100 cents on the dollar, as well as with the expectation of getting something on his own stock and for the other stockholders. Yet for the entire accounts receivable, including the equity mentioned, he was unwilling to give $7,000 when the creditors' committee was willing to recommend that the trustee accept it and the trustee apparently was willing to sell for that price. If we add the $7,000 and the $4,000, the total would be $11,000, with which to pay $16,000.

So, if we should apply the second test I have discussed, there was insolvency.

We have had a lot of testimony by an accountant. He made a comprehensive review of the books. Counsel have fully examined him as to how he arrived at every figure of consequence which he used. Out of the mass of material gone over he has furnished a pretty definite statement of both assets and liabilities. I think I should go over it and give it careful attention.

According to the evidence, the total debts were $35,000. That sum is accepted by both sides. It is borne out by the books as well as by the oral testimony.

According to the accountant's scheme of putting his valuations on the assets, they should have yielded slightly over $48,000. It will be noted that these identical assets as a whole yielded only $5,569 when they were actually sold during the bankruptcy proceeding; and the tangible portion was put down, as I recall, in the schedules at $2,900 or thereabouts. It is to be observed also that for the intangible portion, which was the greater part, Mr. Segal was not willing to pay as much as $7,000. Yet the accountant, according to his method of figuring, arrived at $48,000 as the valuation of all the assets; that is to say, the accountant made estimates leading to that figure, under cross-examination by counsel for one of the defendants.

Let us see if $48,000 is a fair sum to be accepted through application of any of the tests which have been laid down by law. Let us employ some of the tests to ascertain, first, whether the amount allocated by the accountant to the accounts receivable is fair.

In the tabulation by which the accountant under cross-examination arrived at the figure of $48,000, he included the receivables in their entirety at a valuation of $39,000; the remainder of the assets working out at $9,000. Max Segal himself got $3,000 of accounts receivable. The testimony of Miss Cohen, as well as all the other testimony on the sub-

ject, indicates that the receivables turned over to him were choice. After about twenty-two months these netted him $914; in other words, considerably less than one-third of their face.

The entire face of the accounts receivable carried in the accountant's statement was, as of February 19, 1932, a little less than $78,000. If they were worth one-third—that is to say, if we should use the test of realization by twenty-two months of handling, which brought in less than a third—the total value would be $26,000. Could it be expected, however, if the accounts were put on the market for present sale in a transaction between a willing seller and a willing buyer, that they would bring as much as by twenty-two months of effort? Obviously not. Or if we were to apply the test of giving to the bankrupt itself an opportunity within a reasonable time to collect on them, could it be expected that as high a ratio would come in as arose from the activity of Max Segal in pursuing choice receivables? It seems to me that, when in twenty-two months he could get only a third, the application of the test of one-third, as a criterion to determine what is a fair valuation in the sense of the bankruptcy statute, cannot properly be complained of by the defendants. Moreover, it is to be borne in mind that the one-third is taken from the actual handling by Max Segal himself, who was the collector for the bankrupt and knew the business.

Again, when analyzed, the testimony of Mr. Zagoren, who has had long experience with an entirely different concern in the line of business in which the bankrupt was engaged, is in substance that he employs about the same one-third test in estimating the value of receivables generally.

One-third of $78,000 is $26,000. In other words, this would mean that instead, as the accountant did, of putting the receivables in his statement at a valuation of $39,000, they should be put in at only $26,000. If that were done, then, standing alone, this would cause a reduction by $13,000 of the $48,000 total valuation put on by the accountant for all the assets as of February 19, 1932. Without any other change, on that basis, the assets would be worth $35,000, which is the precise amount of the liabilities. Is this, however, fair to the trustee in bankruptcy?

Analysis of the bankrupt's income tax return and of other documents in evidence shows that, at the minimum, $41,000 of the accounts receivable involved go back to the day of John Connors individually. They consist of debts owing by his personal customers, which came into existence prior to the organization of the corporation. They were considerably more than a year old at the time of the transactions under inquiry. At the time of the bankruptcy they were fifteen months old. Another analysis of the figures would carry the receivables, which should be classed as John Connors' old accounts, to as high as $53,000. Let us see what is the result.

If there were, $41,000 of the accounts which were fifteen months old in the group with which we are dealing, a maximum allowance for their value would be 10 per cent. of their face; and I think it defies common sense to suppose that the corporation could have made a sale at higher than 10 per cent. of their face of accounts fifteen months old or over a year old. Indeed, it is a matter of general knowledge that it cannot be done in this community. If it be assumed that for the $41,000 there should be an allowance of only 10 per cent., that would put their value at $4,000. Deducting $41,000 from the $78,000 total of the receivables, there would be left $37,000. Applying to the $37,000 the same figure, previously used, of a yield of one-third, we would have for them a value of just a little over $12,000—call it $13,000. That would give a total yield from the whole of the accounts receivable of $17,000, instead of $39,000. If the yield were only $17,000, instead of the $39,000 carried in the accountant's statement as the value of all receivables, this would mean a reduction of the $48,000, as the accountant's total valuation of all assets, by the difference between the $17,000 and the $39,000, namely, by $22,000, and that would show the corporation to have been grossly insolvent.

The situation is even worse if we accept the other analysis, which is plausible. It would show that the accounts receivable going back to the time of their creation, when John Connors individually was doing business, ran as high as $53,000. The situation is still worse. The figure of $48,000 was made up on the assumption that the cost of collection would be $3,120. That is based on an estimated period for the collection and the salaries of two collectors. But, as I understood Zagoren, the minimum at which collections could be made is 20 per cent. If we should employ this 20 per cent. minimum, there would be an added 10 per cent. for cost of collection, which would further reduce the

$48,000 as a valuation. Moreover, the testimony showed that there were other items of cost of collection likely to arise in the way of attorneys' fees, court costs, and the like, which were not included in the 20 per cent.

It is perfectly plain that the rent deposit was not a salable asset. It therefore cannot properly be included in determining whether or not there was solvency or insolvency, and I do not understand either side to contend that it ought to be included.

Let me comment just a bit more upon the tangible assets. The accountant carried them in his statement as follows: The merchandise inventory at $4,200; the furniture and fixtures at $600; and the automobile at $300 —making a total of $5,100. They were sold for $2,635. The schedule signed by Mr. Segal himself, as I recall it, shows a valuation for them of $2,900. If we were to accept Mr. Segal's own statement, that further reduces the amount.

It is plain to me that the bankrupt corporation was insolvent on February 19, 1932, and continued to be insolvent from then until the filing of the bankruptcy petition. There are some general facts which strongly substantiate this conclusion.

Why did Mr. Segal go into court and voluntarily throw the corporation into bankruptcy if it was not insolvent? His conduct is in the nature of an admission of insolvency. On $53,000 of gross business in the year 1931, the corporation lost $26,000. It went through a hard strain with its bank account in the latter part of 1931 and, save a comparatively few days, from September to January and for the whole period of 1932 up to its going into bankruptcy.

All those circumstances further persuade me that, upon actually applying any of the tests that are to be derived from the court decisions to which I have referred, the corporation was insolvent on February 19, 1932, and on any of the other relevant dates.

As counsel have recognized, there are two branches of our inquiry. The first relates to the $1,500 payment to the defendant bank on February 19, 1932. I shall now give consideration to that.

In the first place, is the bank liable for this sum?

It is clear that the bank, on being paid in full, received a percentage greater than other creditors of the same class got or can ever get. The bankrupt then being insolvent, the sole question, as to whether there can be recovery against the bank under the first cause of action, is whether it had notice or reasonable cause to believe that a preference would be effected.

On the issue of notice, I am not going into the same kind of long discussion that I have indulged in as to the question of solvency, which is the principal issue made by the parties at this trial. The evidence relating to notice lends itself to divergent inferences. It suffices to say that I think it would be entirely too strict a rule to apply to a bank or to business men to hold, under the proof, that the bank was put on inquiry. It would be practically impossible to carry on business, or for business men to get accommodations, if the kind of scrutiny which the evidence shows the representatives of the bank made—and of which they made notations in their credit files—were to be construed as putting them on inquiry as to whether the borrower from them was insolvent. I think the conduct of the bank straight through indicates that not only was it relying chiefly on Mr. Segal and his wife as indorsers, but that it did not, on analysis of the financial statement furnished by the corporation, regard the corporation as a bad risk for the $1,500 loan. What the bank's officials did say was that the corporation was an undesirable kind of a customer, because it was engaged in a type of business where its assets ran so much into receivables, and that such receivables were an undesirable form of security for a bank to have to rely on or to be forced to acquire as an asset. I think that is all.

To have a depleted bank account in ordinary times would mean more than it has meant in the past four years, particularly during the last year or two. It is matter of general knowledge that there are plenty of people who have ample assets and who are not insolvent, but who are low in cash and have not had any money. It is also matter of general knowledge that this condition has prevailed for several years. I think the non-payment of small checks drawn on the bank by the corporation must be interpreted in the light of the facts I have mentioned.

Mr. Segal and the representatives of the bank are in accord in their statements that there was really nothing to put the bank on inquiry that the corporation was insolvent. If I should hold that there was notice or adequate basis for compelling inquiry, I should have to draw inferences contrary to the outright testimony of all the witnesses who know

anything about the matter. Those inferences would edge over into speculation or conjecture.

I therefore do not feel that the proof warrants a recovery against the bank on the charge that it was preferred.

■ So also I think that there was no fraudulent conveyance to the bank. That is settled by Irving Trust Co. v. Chase Nat. Bank (C. C. A.) 65 F.(2d) 409. The bank had no knowledge that an auction had occurred. At the best, the treatment of the bank by its customer can be described only as preferring the bank over its other creditors. Under the facts, the second cause of action comes squarely within the ruling cited and therefore must fail.

■ Next, with respect to the $1,500 item, in the sense of the bankruptcy statute were Jacob and Elsie Segal preferred?

It is undisputed, Mr. Segal tells us, that throughout the entire period he represented and acted for his wife, Elsie Segal. There is nothing unusual about that. What he knew, she knew. The only inquiry, therefore, is whether the evidence establishes a right of recovery against him; because, if it does, it establishes also a right of recovery against her.

I have already determined that the corporation was insolvent. The situation of the bank with respect to knowledge or reasonable cause to believe is quite different from the situation of Mr. Segal. He was in the active conduct of the business of the corporation. If the corporation was insolvent, indisputably he knew it. He was not merely put on inquiry. He knew it. If that be so, then the only question under the third cause of action is whether, as indorsers, he and his wife come within the same class as direct creditors. That they do is settled by the Schleicher Printing Corporation Case (C. C. A.) 62 F.(2d) 503.

Note the wording of the statute. The language is, if "the bankrupt be insolvent and the * * * transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such * * * transfer would effect a preference, it shall be voidable." 11 USCA § 96 (b). Here there exists every element of a preference—each element is established by the proof—with respect to the indorsers of the $1,500 note to the bank. The corporation was insolvent. The indorsers knew it was insolvent. The indorsers knew that to pay the bank would effect a preference of the bank over other creditors of the same class. They knew also that by the payment the indorsers would be benefited, in that they would thereby escape having out of their own pockets to pay the bank.

As I see it, therefore, on his own statement both Mr. Jacob Segal and his wife are liable for the $1,500.

■ There is another ground on which it is plain that Mr. Jacob Segal is liable for the $1,500 item. He was an officer and director of the corporation. An officer and director of a corporation must exercise care in handling its business. It is perfectly clear, it is undisputed, that at the time—that is, when the bank got the $1,500 on February 19, 1932 —the corporation had failed to pay its obligations when due and had failed to pay its written obligations. It had failed to pay obligations of the same kind as promissory notes. At the time it was organized, the corporation, in writing, had assumed the obligations of the lease. The lease required the payment of rent, and it required the payment of taxes. Both rent and taxes had been in default for a long time prior to February 19, 1932. At that date, also at subsequent dates that are involved, the overdue and unpaid amount of those two items was some five or six thousand dollars. There is proof also that the Webb note owing by the corporation was overdue. I see no occasion, however, to go into that, because it is incontrovertibly shown by the evidence that there was a considerable amount due and owing for rent and taxes under the lease, which the corporation had failed and refused to pay.

The first sentence of section 15 of the Stock Corporation Law (Consol. Laws, c. 59) makes it the duty of the court to set aside the transfer of any property of a corporation to one of its officers or directors, whether the transfer to that officer or director be direct or indirect. It seems to me that, when a transfer is for the personal benefit of the officer or director, through relieving him from liability as indorser, then he comes within the first sentence of the section, and that the sum transferred is recoverable from him. However, I confess that I have found no direct adjudication on the point, and none has been furnished me. It is not really necessary, however, to determine the issue arising under the first sentence, because the second sentence of the section obviously applies.

It is perfectly plain that the transfer of the $1,500 to the bank was made by Mr. Segal. He is the very man who did it. Under the second sentence a transfer by an officer or director "when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation" is invalid, "except as to any rights or interests which may be acquired thereunder by any person without notice or reasonable cause to believe that such * * * transfer * * * would effect a preference." The last clause quoted has no application to the person making the transfer. Rather it applies to the person who gets the preference. Here it is manifest that the very intention of making the payment in full— the very intention of making the auction sale of assets to provide the money with which to pay in full—in advance of maturity, was to give the bank a preference and to release the indorsers from further liability.

So, as I see it, there is the additional ground upon which, on the undisputed proof, Mr. Jacob Segal individually is liable if the corporation was in fact insolvent, as I have found it was, at the time of the $1,500 payment to the bank.

Let us turn now to the other item involved in the case, namely, the accounts receivable assigned to Max Segal.

On the testimony of Jacob Segal himself and on the testimony of Max Segal himself, both of them are liable for those accounts receivable. Their liability is established by the decision of the Supreme Court of the United States in Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 691. On the facts, as they have been shown without dispute here, there is a precise precedent also in Irving Trust Co. v. Finance Service Co. (C. C. A.) 63 F.(2d) 694. This conclusion cannot be escaped.

What happened in the case at bar? The transferor—and I am assuming that there was a transfer as claimed by Mr. Jacob Segal and his son—after the transfer continued to collect the assigned accounts receivable. The transferor not only deposited the proceeds of the collections in its own bank, to its own general credit there, but it applied them to its own uses at will. There was no accountability whatsoever to the transferee. The transferor was left free to handle those accounts and their collection as it saw fit; and it did so. That brings this case within Benedict v. Ratner.

The writings relating to the assignment did not in terms provide that the proceeds should be used in the way in which they were actually used. Nevertheless, the inference is unavoidable that it was the understanding between the parties that what was done would be done. Mr. Segal and his son both say that the arrangement was left entirely in the father's hands. The son says that he himself made the collections and turned over the money to the corporation, exactly as he did with the proceeds of his collections of other accounts for the corporation. It also was stated by the witnesses that the original loan of $1,500, alleged to have been made by the son, was reduced to $1,050 through direct payments by the corporation, out of its own other funds, preceding the bankruptcy. The conclusion is therefore inescapable that domination and control of the accounts alleged to have been assigned to the son were left to the corporation.

Was there a preference by the transfer?

Assuming again that the transfer was made to Max Segal and assuming that the money advanced to the corporation belonged to him, the testimony of the same two gentlemen is that the father acted throughout for the son. Whatever the father knew, the son knew. We are not concerned with what happened back in December, 1931. Under the pleadings what is sought to be set aside is a transfer of accounts receivable made in March, 1932. I have already found that the corporation was insolvent from February 19 on to the filing of the bankruptcy petition; also that Jacob Segal, who was conducting the corporation, then knew that it was insolvent. If there be even doubt as to the extent of his knowledge, he was certainly put on inquiry as to whether it was insolvent, and he surely would have learned that it was insolvent if he had pursued the inquiry. Some $3,000 of receivables were transferred by the corporation. For what was owing, or claimed to have been owing, to Max Segal something in excess of $900 has been collected, and there is an unascertained amount of the securities still held by him. It is clear, therefore, that, if he was a creditor, a preference was effected.

As I see it, it does not make any difference what happened back in December, 1931, because the transfer under inquiry was made in March, 1932, a portion on March 3 and a portion on March 12. It was the condition of the corporation in March, 1932, in which we are interested, for the reason that it was

not until then that the transfer of the accounts receivable occurred. Even though it were conceded that the transfer of the Moose account on December 22, 1931, was valid, that is no justification of or excuse for, nor does it render valid, the transfer in March, 1932, of other property. It is this other property, a portion of it transferred on March 3 and a portion on March 12, that is under consideration now. Moreover, it is pretty plain that at the time of the transfer of the new accounts receivable in March the Moose collateral had become entirely worthless.

I see no occasion to go into the questions of whether or not originally there was an assignment of the Moose collateral or whether or not the $1,500, which the father himself turned over to the corporation on December 22, 1931, was a loan made by him on behalf of his son. The answer of either question favorably to defendants' contention would not make the slightest difference in the result.

Certainly, to say the best of it, the book entries are confusing. I do not for a moment mistrust the young woman bookkeeper. Clearly, however, she made the book entries and she drew the papers under instructions. She was not a principal in any of these matters. The instructions must have come from Jacob Segal, and it is most extraordinary that the loan is entered in the books as made by him.

There is another fact about the books to which I should call your attention. It is most curious that there ever should have been an entry on March 3, 1932, of a loan from Max Segal. As Miss Cohen explained the system of bookkeeping, the entry did not belong at all in the book where it is found. Under the practice, the bills payable book should not carry the loan of Max Segal any more than it should carry—and it did not carry —the loans from the Finance Service Company. Yet the Max Segal loan is stuck in there as having been made on March 3. The bookkeeper did not put in any loan by him on December 22. Yet when March 3 rolled around she recorded in this book the loan of Max Segal.

Again, the assignment of the Moose collateral has not been produced. As I understand, all the papers of the bankrupt corporation were turned over to the trustee and all the counsel for Mr. Segal could do at this stage was to call on the trustee to produce them; but the trustee has not produced them, and the trustee's counsel says the trustee never had them. This situation raises a question, under several decisions of the Supreme Court of the United States, as to what significance is to be attached to silence. You will find the discussion of the subject very interesting in Bilokumsky v. Tod, 263 U. S. 149, 44 S. Ct. 54, 68 L. Ed. 221, by Mr. Justice Brandeis, and in Mammoth Oil Co. v. United States, 275 U. S. 13, 48 S. Ct. 1, 72 L. Ed. 137, by Mr. Justice Butler.

As I have heretofore indicated, there are some puzzling things in the testimony about the loan and about the Moose collateral. Who really made the loan in December? Was it the father or was it the son? What has become of the documents covering assignment of the Moose account? Were the transfers to Max Segal in March, 1932, new, or was there a substitution then of other accounts in the place of the surrendered Moose account? I am glad that there is no need for me to determine whether the $1,500, which the corporation received on December 22, belonged to the father or to the son or whether actually there was an assignment of the Moose collateral to Max Segal in December, 1931.

As I have said with respect to the $1,500 item, so I say with respect to the accounts receivable item, that all the elements of a case under section 15 of the Stock Corporation Law are made out as against Jacob Segal.

The result is as follows:

First, the bill must be dismissed as against the bank.

Second, the trustee is entitled to recover from Jacob Segal $2,414.94, with interest on $1,500 from February 19, 1932, and on $793.-94 from May 24, 1933, and $121.50 from January 2, 1934.

Third, the trustee is entitled to a recovery from Elsie Segal of $1,500, with interest from February 19, 1932.

Fourth, the trustee is entitled to recover from Max Segal $914.94, with interest on $793.94 from May 24, 1933, and on $121.50 from January 2, 1934.

Fifth, Max Segal will be required to retransfer to the trustee all accounts receivable, included in the assignments from the corporation to him, which remained uncollected at January 2, 1934, together with any collections thereon he may have made since that date.

Sixth, the amounts covered by the third and fourth paragraphs are the same as the corresponding sums covered by the second paragraph, and the trustee is entitled to but

one satisfaction, from whomsoever it comes, of the total amount of $2,414.94, with interest as stated.

Settle decree on three days' notice.