**Theodore MACK, as Designee of the Creditors' Committee of Texas Consumer Finance Corporation and Texas Consumer Finance Corporation, a Debtor in Possession, Plaintiffs,**

v.

**BANK OF LANSING, Defendant.**

**Civ. No. G234–72–CA 5.**

United States District Court,
W. D. Michigan, S. D.

Jan. 27, 1975.

---

Murray B. DeGroot, Grand Rapids, Mich., for plaintiff Mack.

Arthur Ungerman, Dallas, Tex., for plaintiff Consumer Finance Corp.

William D. Parsley, Lansing, Mich., for defendant Bank of Lansing.

## FINDINGS OF FACT, OPINION, AND CONCLUSIONS OF LAW

CARL B. RUBIN, District Judge.

This is an action to recover allegedly voidable preferences pursuant to § 60 of the Bankruptcy Act, 11 U.S.C. § 96.

Pursuant to agreement and in accordance with Rule 42 of the Federal Rules of Civil Procedure, this case and Civil No. K87–72–CA 4, entitled: *Texas Consumer Finance Corporation, Debtor in Possession, and Theodore Mack, Desig-*nee of the Creditors' Committee of Texas Consumer Finance Corporation v. In-dustrial State Bank and Trust Company, were consolidated for trial as to issues common to both and tried separately and in succession on issues unique to each case. Trial to the Court occurred on October 28, 29, 30, 1974. In accordance with the foregoing, and pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court does submit herewith its Findings of Fact, Opinion, and Conclusions of Law.

### I

### FINDINGS OF FACT

1. Texas Consumer Finance Corporation, also referred to herein as "TCFC", was engaged prior to 1970 in the consumer finance business. It made small loans to individuals. It maintained branches in Texas, Oklahoma, Southern California and Louisiana. At the beginning of 1970 it had accounts with more than 50,000 customers. As is customary in the consumer finance industry, Texas Consumer Finance Corporation was both a lender and a borrower of cash. Its loans were usually small quantities and for purposes of financing the purchase of personal property or for other reasons satisfactory to their borrowers. Such loans bear substantial interest rates ranging from 18% to 36% per annum. Texas Consumer Finance Corporation did not purchase "paper" which represented financial transactions by sellers of personal property who accepted notes and mortgages in return for the sale of tangible merchandise.

2. As a borrower, Texas Consumer Finance Corporation dealt with numerous banks who extended credit for limited periods of time. It also sold preferred stock, its own "commercial paper," and negotiated long term loans. Other than the creation of creditors bearing different relationships to Texas Consumer Finance Corporation, these non-banking forms of cash acquisition have no significance herein.

By far the largest amount of cash was acquired from some 140 banks in the United States on the following basis: A line of credit was obtained from each of such banks representing the maximum amount that such bank was prepared to lend Texas Consumer Finance Corporation at any given time.

The bank loan would be negotiated on a 90-day basis, renewed periodically, and customarily repaid. It is a standard industry practice and Texas Consumer Finance Corporation did so arrange its affairs that in any 12-month period it would be a borrower for nine or ten months from a specific bank and paid up for the remaining two or three months. Such period of full payment is known as the "out period." As a result, more lines of credit were available than were in use at any given time.

3. The Texas Consumer Finance Corporation issued an audited statement once a year at the end of the calendar year. The statements contained the customary certificate from Price, Waterhouse & Company, a recognized national certified public accounting firm. The financial statement dated December 31, 1969, indicated a net worth of $12,500,000.00. In accordance also with the custom in the industry, this statement was distributed approximately April 1, 1970. The statement differed from the previous year's statement in that it did not contain a "funds statement,"[1] and in listing the banks with whom it had lines of credit, did not include the Republic Bank of Dallas, Texas.

4. A "funds statement" was not required as part of the financial statement, nor would it contain facts which could not be derived from the financial statement by a credit analyst. The financial statement contained no facts which would have brought the solvency of Texas Consumer Finance Corporation into question. Each defendant bank inquired as to the dropping of the line of credit by the Republic Bank of Dallas. That bank's response showed only a disenchantment with the new ownership and recent acquisition of Fidelity General Insurance Company. It specifically disclaimed any knowledge that Texas Consumer Finance Corporation was not a good credit risk.

5. Defendant Bank of Lansing began its dealings with Texas Consumer Finance Corporation in August of 1966 at which time a line of credit of $250,000.00 was established with an interest rate at ½ of 1% over the prime rate. Texas Consumer Finance Corporation was required at all times, even during the "out period", to maintain an account balance equal to 20% of the maximum borrowable under the credit line. Transactions between the two companies continued in accordance with the custom as outlined in Finding of Fact 2 from August, 1966 through June, 1969. The line of credit was formally terminated by the Bank in September of 1969 but reinstated on the express condition that the Texas Consumer Finance Corporation would not use the line for the remainder of the 1969 year. On January 5, 1970, Texas Consumer Finance Corporation borrowed $165,000.00 from the Bank of Lansing evidenced by a promissory note payable on or about April 2, 1970, with interest at a rate equal to ½ of 1% over prime. Pursuant to the agreement that the balance remaining in the bank equal 20%, Texas Consumer Finance Corporation maintained a deposit in the sum of $33,000.00 with the Bank.

The January note matured on April 2, 1970, and was renewed for 88 days by a new note maturing June 29, 1970. In the spring of 1970 defendant experienced problems of liquidity and on May

---

1. Subsequent to the trial of this matter counsel agreed that the following is an acceptable definition of a funds statement:

A funds statement shows the source and application of funds as well as change in the financial position of a corporation as reflected by an increase or decrease in working capital.

20, 1970, the Bank of Lansing Executive Committee terminated lines of credit to consumer finance companies including Texas Consumer Finance Corporation. Notice of such termination was given. On June 26, 1970, Texas Consumer Finance Corporation requested an extension of the line for an additional ninety-one days due to the difficulty of restructuring its bank rotation schedule upon short notice.

On June 30, 1970, the Bank of Lansing appropriated the $33,000.00 compensating balance of Texas Consumer Finance Corporation and on July 2, 1970, declined to renew the note. On July 2, 1970, Texas Consumer Finance Corporation was granted an extension of time until July 6, 1970, to repay the $132,219.34 still owing on its note. A check in that amount was issued to the Bank of Lansing on July 6, 1970, received by them and paid by established bank processing procedures on July 13, 1970. At no time during this period was Texas Consumer Finance Corporation's solvency brought into question.

6. During the months of April, May, and June of 1970, banks extending lines of credit to Texas Consumer Finance Corporation decreased from 147 to less than 100. As of December 31, 1969, Texas Consumer Finance Corporation had borrowed 68.7% of its maximum lines of credit; by June 12, 1970, it had borrowed 89.1% of its maximum lines of credit. Between those two dates the total amount of borrowing decreased from $28,840,000 on December 31, 1969, to $17,584,000.00 on June 12, 1969.

7. The largest asset of a consumer finance business is its accounts receivable. Approximately 80% of the assets of Texas Consumer Finance Corporation were its direct installment loans. The statement of December 31, 1969, listed accounts receivable at $43,692,678.00. This amount was largely overstated. A large number of all accounts had not had a payment for over a year, had a last payment of $1.00 or less, or represented loans with monthly payments of less than $5.00 with a "balloon" payment at the end. The expert testimony of plaintiff witness Del Low, based upon his analysis of a computer print-out and the use of some statistical techniques, established by a preponderance of the evidence that Texas Consumer Finance Corporation was in fact insolvent on July 15, 1970, when defendant Bank of Lansing was repaid the face amount of its loan.

8. A preponderance of the evidence has established that the payment to this defendant was a transfer of property for the benefit of a creditor on account of an antecedent debt.

9. On August 17, 1970, Texas Consumer Finance Corporation filed a petition in the Bankruptcy Court for the Northern District of Texas, Fort Worth Division, seeking an arrangement under Chapter XI of the Bankruptcy Act. On December 29, 1970, an Order was entered by the Referee in Bankruptcy confirming a plan of arrangement. On April 6, 1971, Texas Consumer Finance Corporation, both as debtor in possession and debtor, assigned to plaintiff, Theodore Mack, designee of the Creditors' Committee, all causes of action which such Texas Consumer Finance Corporation had or might have against the defendant herein.

10. The payment to defendant Bank of Lansing occurred within four months before the filing of a petition initiating a proceedings under the Bankruptcy Act. Such payment constituted a transfer as defined under the Bankruptcy Act of property of a debtor for the benefit of a creditor on account of an antecedent debt. The payment enabled this defendant to obtain a greater percentage of its debts than other members of its class.

11. Texas Consumer Finance Corporation has failed to prove by a preponderance of the evidence that defendant had reasonable cause to believe it was insolvent on the dates of the transfers in question. Defendant had no notice or knowledge of facts which would have caused it to make an inquiry into the

solvency of the Texas Consumer Finance Corporation.

## II

### OPINION

Resolution of these matters requires consideration of Section 60(a)(1) of The Bankruptcy Act which provides as follows:

A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

This section contains the following elements:

1. transfer of property;
2. for the benefit of a creditor;
3. for an antecedent debt;
4. made by an insolvent debtor;
5. within four months of the filing of a petition under the Act;
6. resulting in such creditor receiving a greater percentage of his claim than another creditor of the same class.

Section 60(b) adds a seventh element: a reasonable cause to believe that the debtor is insolvent.

Prior to a discussion of this issue it is necessary to resolve certain other questions raised by the defendant.

■ It is contended that neither plaintiff may properly bring an action to recover a preferential transfer pursuant to Section 60 of the Bankruptcy Act. It is initially argued that a debtor in possession has no right to recover a preference in a Chapter XI bankruptcy proceeding; however, this view is without support in the law. Section 342 of the Bankruptcy Act provides that when no receiver or trustee is appointed: ". . . the debtor shall continue in possession of his property and shall have all the title and exercise all the powers of a trustee appointed under this Act, subject, however, at all times to the control of the court and to such limitations, restrictions, terms and conditions as the court may from time to time prescribe." 11 U.S.C. § 742. This section has been uniformly construed to include "rights" as well as "powers" of the trustee. *Re Savage Mills, Inc.*, 170 F.Supp. 559 (E.D.N.Y.1959); *Re Roosevelt Lanes, Inc.*, 234 F.Supp. 842 (E.D.N.Y.1964), *aff'd* 342 F.2d 1000; *Re Whitman Center, Inc.*, 285 F.Supp. 199 (C.D.Cal.1968); *Schokbeton Industries, Inc.* v. *Schokbeton Products Corp.*, 466 F.2d 171 (7th Cir. 1972). Section 60(b) of the Bankruptcy Act provides that preferences "may be avoided by the trustee." Whether this is viewed as a power or a right, the debtor in possession may sue to recover a preference. 8 *Collier on Bankruptcy*, ¶ 6.32 at 980–81 (1971); *Texas Consumer Finance Corp.* v. *First National City Bank*, 365 F.Supp. 427 (S.D.N.Y.1973), *cf. In Re Martin Custom Made Tires Corp.*, 108 F.2d 172 (2d Cir. 1939).

■ It has been held that Theodore Mack, as "designee" of the Creditors' Committee may not maintain an action to recover a preference for the reason that the debtor in possession may not assign his claim. *Texas Consumer Finance Corp.* v. *First National City Bank, supra.* A review of the Opinion of Judge Gurfein and the authorities cited therein convinces this Court that the decision is correct.

■ The further argument of the defendant that the debtor in possession, having assigned his claim, may not now maintain this action is not persuasive. An invalid assignment does not operate so as to deprive the assignor from seeking recovery upon the claim in question.

We now consider the necessary elements of a voidable preference. Little attention need be given to elements one,

"transfer of property"; two, "for the benefit of the creditor"; three, "for an antecedent debt", (See Finding of Fact 9); five, "within four months of the filing of a petition under the Act", (See Finding of Fact 10).

While element four, "made by an insolvent debtor", is the subject of Finding of Fact 8, it does bear further discussion.

The requirement that the transfer be made or suffered by the debtor "while insolvent" is an issue of fact to be resolved by the Court on the basis of the evidence presented at trial, *Kaufman v. Tredway*, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904). Insolvency for the purposes of voidable preferences is defined as when the aggregate of the debtor's property shall not be sufficient in amount to pay his debts.[2]

It has been characterized as a balance sheet test. *Syracuse Engineering Co., Inc. v. Haight*, 110 F.2d 468 (5th Cir. 1940); *Farmers Bank of Clinton, Missouri v. Julian*, 383 F.2d 314 (8th Cir. 1967); *cert. den.* 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662. Thus, a person may be solvent within the meaning of the Bankruptcy Act, even though he is unable to meet current liabilities where the fair evaluation of his assets is sufficient to meet his debts. *Cohen v. Sutherland*, 257 F.2d 737 (2d Cir. 1958).

The plaintiff has the burden of proving insolvency upon the date of the transfer; yet, as a computation of the exact value of the debtors' assets for a particular point in time is always difficult and often impossible, the Courts have uniformly allowed circumstantial evidence of insolvency to be offered in its stead. Proof that a debtor was insolvent at a later point in time and that nothing unusual intervened in the interim which would substantially alter or affect the financial worth of the debtor is sufficient to meet the plaintiff's burden. *Irving Trust Co. v. Manufacturers' Trust Co.*, 6 F.Supp. 185 (S.D.N.Y. 1934). Opinion evidence as to the value of account receivables is admissible where the witness is shown to be qualified by his experience and general information concerning the trade in which the debtor was engaged to form an opinion as to the fair value of the obligations; *Irving Trust Co. v. Jacob Weckstein & Sons*, 64 F.2d 333 (2d Cir. 1933). Books of the debtor and computations of assets and liabilities based thereon by accountants are competent evidence of the question of solvency; *Abdo v. Townshend*, 282 F. 476 (4th Cir. 1922); *Badders Clothing Co. v. Burnham-Root Dry Goods Co.*, 288 F. 470 (10th Cir. 1915); *Williams v. Platter*, 46 F.2d 467 (E.D.N.Y.1931).

As previously noted the testimony of witness Low established the insolvency to the Court's satisfaction.

Element six of a voidable preference requires a showing that the creditor in question received a greater percentage of the claim than other creditors of the same class. The defendant herein was an unsecured credit line bank at the time of the transfer in question. The undisputed testimony of Mr. Cruickshank was that other general creditors including banks extending lines of credit at the time of the filing of the petition, would receive only about 57% of their respective claims.[3] The defendant received payment of 100% of its claims. The purpose of the Bankruptcy Act in general, and of Section 60, voida-

---

2. Section 1(19) of the Bankruptcy Act:

   A person shall be deemed insolvent within the provisions of this Act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his cred-

itors, shall not at a fair valuation be sufficient in amount to pay his debts.
11 U.S.C. § 1(19).

3. The word "class" as used in Section 60 of the Bankruptcy Act has reference to the classes created by Section 64. (11 U.S.C. § 104). *Swarts v. Fourth National Bank*, 117 F. (8th Cir. 1902).

ble preferences, in particular, is to guarantee an equal sharing of assets among all creditors of the bankrupt's estate, including those who exact full payment of debts prior to the filing of the petition but while the debtor is insolvent. The Court finds the effect of the transfer to have enabled the defendant to obtain a greater percentage of its debts than other members of its class.

The foregoing elements have established that the defendant herein did in fact receive a *preference* as that term is defined in Section 60(a) of the Bankruptcy Act.

There now remains for consideration the question of whether such preference is *voidable* for Section 60(b) of the Bankruptcy Act requires that a creditor, at the time the transfer was received, have reasonable cause to believe that the debtor was insolvent. As Judge Learned Hand most aptly remarked in one case: "That creditor only the statute proscribes who dips his hand into a pot which he knows will not go round.", *Kennard* v. *Behrer*, 270 F. 661 (S.D.N. Y.1920).

■■■ Whether the creditor had reasonable cause to believe the debtor insolvent is a question of fact to be determined from the facts, circumstances and surroundings of the case. *McDougal* v. *Central Union Conference Association*, 110 F.2d 939 (10th Cir. 1940). The question is not one of whether the creditor did believe that the debtor was insolvent, but of whether, under the circumstances, he was chargeable with knowledge of facts from a reasonable evaluation of which he should have so believed. Facts which are sufficient to incite a man of reasonable prudence to make inquiry into the solvency of the debtor charge the creditor with all the knowledge he could have acquired by the exercise of reasonable diligence. *McDougal* v. *Central Union Conference Association, supra*; *Mayo* v. *Pioneer Bank and Trust Co.*, 297 F.2d 392 (5th Cir. 1961); *Dudley* v. *Eberly*, 201 F.Supp. 728 (D.Or.1962), *aff'd* 314 F.2d 8;

*Dean* v. *Planters National Bank of Hughes*, 176 F.Supp. 909 (E.D.Ark. 1959).

■■■ Plaintiffs' burden of proving the creditor had reasonable cause to believe the debtor to be insolvent must be sustained by a preponderance of the evidence. A most careful review of the evidence presented at trial reveals that no facts which would have suggested *insolvency* were brought to defendant's attention prior to or at the time of the transfer. It is one thing to work backward from a known insolvency and find irregularities in financial statements, mistaken business judgments and questionable accounting procedures. It is quite another to charge a financial institution with a duty of inquiry which far exceeds normal business practice when each normal inquiry not only indicates substantially more assets than liabilities, but also an improving business picture. The plaintiff's failure in this regard stems from the fact that the debtor was able to conceal its true financial worth from all but a comprehensive examination of its installment account receivables, *or* a general restriction in the lines of credit available.

The plaintiff's expert, Mr. Low, proved to the Court's satisfaction that a detailed examination of TCFC's assets would have shown them to be highly overvalued. Yet, the Court is unable to say the law imposes a duty or obligation upon banks to make such an inquiry, absent some other factor. The financial statement of Price-Waterhouse indicated a net worth in TCFC of over $12,000,000. Each item of the missing and unrequired funds statement could be gathered from the financial statement. None of the derived information would have indicated insolvency. Transactions criticised by the plaintiff's witness were matters of business judgment. Inquiries directed to lead banks brought assurances of the plaintiff's good financial standing. Despite insinuation that the grapevine of banks passed along rumors of insolvency, there has been presented

 

no evidence upon which such inference could be based. In summary, there have been presented no facts to the Court which should have raised a question of the debtor's solvency in a reasonably prudent creditor's mind.

[14] Accordingly, the Court must hold the debtor in possession has failed to prove defendant had reasonable cause to believe the debtor insolvent at the time of the transfers in question. In so reaching this conclusion the Court has considered all the evidence presented, whether or not referred to specifically in the opinion above.

## III

### *CONCLUSIONS OF LAW*

#### A.

This Court has jurisdiction in accordance with 28 U.S.C. § 1332 and 28 U.S.C. § 1348.

#### B.

A debtor in possession may not assign its claim to a designee of a creditors' committee. Such designee may not maintain an action to recover a preference. The right to maintain such a claim remains at all times with the debtor in possession.

#### C.

To establish a voidable preference a plaintiff must prove by a preponderance of evidence not only that all elements of paragraph 60(a) of the Bankruptcy Act are present, but that at the time of the transfer in question, the preferred creditor must have reasonable cause to believe that the debtor is insolvent.

#### D.

Plaintiff has failed by a preponderance of evidence to establish that the creditor-defendant herein had reasonable cause to believe that the debtor was insolvent at the time of transfer.

#### E.

The transaction involved herein is not a voidable preference within the mean-

ing of Section 60 of the Bankruptcy Act and judgment is hereby granted to the defendant.

Let judgment enter in accordance with the foregoing.