In re UNITED FINANCE CORPORATION.
In re MONEY CORPORATION.

Nos. 6809, 6810.

Circuit Court of Appeals, Seventh Circuit.

May 12, 1939.

Rehearing Denied June 10, 1939.

William E. Kaiser and Livingston E. Osborne, both of Chicago, Ill., for appellants.

David K. Tone and Alvin Glen Hubbard, both of Chicago, Ill., ·for appellees.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

In this case the Money Corporation and the United Finance Corporation are appealing from an order of the district court, finding the corporate appellants insolvent and adjudicating them bankrupt. 30 Stat. 545, 44 Stat. 662, 11 U.S.C.A. § 11. The involuntary petitions in bankruptcy alleged that inter alia the corporate appellants, while insolvent, consented to state receiverships and made preferential transfers. The special master, to whom the case was referred, found that they were solvent, and the court, sustaining the exceptions to the master's report, entered the order above mentioned.

The United Finance Corporation, incorporated in 1919 under the name of Commercial Guaranty Corporation and authorized in 1930 to change its name to Money Corporation and in 1936 to its present name, was engaged primarily in the business of making personal loans. An audit by Baumann, Finney, and Co., Certified Public Accountants, for the· period from August 1, 1924 to September 30, 1935, indicates the existence of an operating deficit amounting to $634,092.82 and reveals a total net worth of $264,973.12. In addition, this audit shows that the corporation operated at a $10,796.99 loss in 1934 and a $17,652.47 loss in 1935.

In 1936 the corporation continued its operations at a loss of $76,282.18 and it was imperative that something be done. On April 28, 1936 the corporation, operating then as the (old) Money Corporation, obtained approval from the Federal Housing Administration to act as mortgagee for FHA mortgages. National Housing Act, 48 Stat. 1246, 12 U.S.C.A. § 1701 et seq. On July 3, 1936 the United Acceptance Corporation was organized, and the United Finance Corporation, operating then as the (old) Money Corporation, transferred some assets to it in exchange for the capital stock. On July 27, 1936 the directors of the

United Finance Corporation (old Money Corporation) passed a resolution authorizing its president to employ an attorney to file a petition for reorganization under Section 77B of the Bankruptcy Act, 11 U. S.C.A. § 207, but this was not done. On September 2, 1936 the United Finance Corporation changed its name of Money Corporation to its present name and reduced its stated capital. On September 4, 1936 the present Money Corporation was organized, and the United Finance Corporation transferred assets to it in exchange for its capital stock.

In this connection it is interesting to note the testimony of Nelson, president of the United Finance Corporation, concerning the organization of the second Money Corporation. Nelson testified that "the only reason for organizing the Money Corporation was to handle the mortgages (FHA) * * *, because the Small Loan Act of Illinois will not permit a company doing business as a small loan office to operate in any other line, so we had to form a separate organization." See Sec. 30, Chap. 74, Ill.Rev.Stats., State Bar Association Ed., (1937). The old Money Corporation received FHA permission in April of 1936, although the Small Loan Act had been approved on July 10, 1935. Moreover, the audits reveal clearly that after the incorporation of the second Money Corporation, the United Finance Corporation immediately transferred its small loans business, having a book value of $113,350.73, to the new corporation, which was incorporated, according to Nelson, to handle the FHA mortgages, separate and distinct from the small loans business. If Nelson's testimony is correct, he was doing with Money Corporation what he contends he could not do with United Finance Corporation (the old Money Corporation).

It is also interesting, at this time, to notice the effect that the change in the capital structure, made September 2, 1936, had on the huge operating deficit that had accumulated. The stated value of the capital stock was reduced or scaled down $751,-593.67, credited to surplus, and then applied against the deficit. In the meantime, the audits show that from September 30, 1935 to September 30, 1936 the assets had decreased from $284,901.27 to $184,448.-58, and the liabilities had increased from $19,928.15 to $88,916.86, while the net worth had fallen from $264,973.12 to $95,-531.72. Moreover, the operating loss for this period was $76,282.18, making an operating loss of $104,731.64 for the years 1934, 1935, and 1936. The balance sheet as of September 30, 1936, after the transfers of assets by the United Finance Corporation to the United Acceptance Corporation[1] on July 3, 1936 and to the Money Corporation on September 4, 1936, indicate that of the net book value of $184,-448.58 given to all the assets, the United Finance Corporation retained only $6,909.-37, although the net book value of its liabilities remained at $79,927.68. It is true that the United Finance Corporation carried the new Money Corporation's capital stock with a book value of $101,000, yet it is imaginable that the creditors might have preferred the assets to the capital stock.

The financial statements as of March 31, 1937 and July 12, 1937 show that the corporations had continued to operate at a loss. The United Finance Corporation had operated at a loss of $24,817.56 from September 30, 1936 to March 31, 1937 and at a loss of $35,908.31 from March 31, 1937 to July 12, 1937. The Money Corporation, which had hardly begun to do business, operated at a loss of $4,694.64 from March 31, 1937 to July 12, 1937. Moreover, the net worth, book valued on September 30, 1935 at $264,973.12, had steadily fallen until on July 12, 1937 it stood at $29,389.39.

There is an abundance of evidence tending to show that the long continual losses from operations had begun to take their heavy toll. The net worth had suffered a huge impairment. The normal demands of creditors could no longer be satisfied adequately. Credit had failed. Lawsuits had begun, and the services of attorneys had become imperative. What little convertible assets remained were utilized to pay off the most pressing creditors, those who threatened to sue or to go to the District Attorney's office. This distressing situation culminated finally, by July 12, 1937, with consent receiverships in the state courts, and on August 7, 1937 the involuntary petitions in bankruptcy were filed.

At the hearing before the special master, much evidence was adduced on values bearing on the pertinent issue of insolven-

---

[1] In February of 1937 all of the assets and liabilities of the United Acceptance Corporation were transferred to the books of the United Finance Corporation.

cy. Appellees introduced in evidence a consolidated balance sheet of the two corporations as of July 12, 1937. This balance sheet, prepared by White and Co., Certified Public Accountants, revealed combined assets of $87,048.94 and combined liabilities of $57,659.55. Of course, an audit report is usually based on conventional accounting practices and indicate not so much values as statements of cost, and, in this particular case, the cost figures were discounted to a certain extent to allow for the failing condition of the debtors. In addition to these discounted book values, appellees offered evidence showing that the fair value of the combined assets was $50,957.12. In turn the corporations adduced evidence that controverted these values. For example, their evidence as to the value of three groups of assets (Notes Receivable, Real Estate Equities, and Accounts Receivable from Applicants and Mortgagors) of the Money Corporation alone totalled over $90,000., which amounts to more than the auditor's figure for all the assets of both corporations.

Appellees' main witness, one Pearce, Certified Public Accountant, stated that the assets looked to him like the "tail end of a business that had been slipping for many years." His theory of valuation was to adopt the "amount that can be collected within a reasonable period of time and at a reasonable amount of expense." Let us take the Notes Receivable group of assets as an example, to which appellees attached a fair value of $5,198.92. Pearce gave a $100 value to the Equipment Finance notes, bearing a book value of $52,568.90. His conclusion was based on the fact that most of these notes went back to the year 1920 and upon which only $176 had been collected in 1937. In this connection, it is to be noted that the White audit placed a book value of $135,127.37 on the Notes Receivable group of assets, but reserved $114,092.55 as a loss. Pearce admitted that he had not independently investigated any of the co-makers and guarantors, placing greater reliance on the ages of the notes and on the lack of collection from maker or co-maker.

As to the batch of judgments in the Notes Receivable group of assets, to which a book value of $41,658.68 was given, the White audit reserved the entire amount at a loss. Pearce, on the other hand, attached a value of $500. to them, saying that his "valuation of judgments is based on the ages of the judgment" and that he considered a "note reduced to judgment worth less than a note that has not been reduced to judgment, * * *, that is, if the judgment is not paid within a reasonable time." Other witnesses for the appellees also testified as to values of certain assets, corroborating Pearce in these instances.

The witnesses for the corporations, on the other hand, valued the assets much higher than appellees' witnesses and the White audit. Most of these witnesses were corporate employees or officers and persons who had contracted to do special services for the corporations. Let us take the Notes Receivable group of assets for an example, to which appellants attached a fair value of around $50,000. This figure is much higher than appellees' figure of $5,198.92 and the auditor's figure of $21,034.82. One Bernsten, who had been a corporate employee for many years, testified that in his opinion the small loans alone in this group of assets were worth $2,500. Pearce's value as to the small loans was $1,200. Bernsten testified that he could collect $2,500 in six or eight months, although he admitted that "all the loans that I have testified to today that were good are in default for some time; have several years default on some of them. All of them had been in default for more than a year before the receivership and I was trying to collect on all the money I could." In the main, the evidence adduced as to the value of the Notes Receivable group of assets was conflicting. In fact, after hearing all the witnesses, the master was uncertain as to the weight to attach to the evidence introduced by the two sides. His value of $18,066.80 on this set of assets is interesting in that it does not vary much from the auditor's figure of $21,034.82.

Finding it impractical to segregate the assets and liabilities by corporation, the master approached the question of solvency by comparing the sum of the aggregate assets and liabilities of both corporations. We believe that the master's approach, i. e., the treatment of the United Finance Corporation and the Money Corporation as one business, was proper and necessary in order to ascertain the true financial status of the debtors. Both corporations had the same officers, directors, and quarters. In addition, in many instances, the corporate expenses were regarded as joint obligations, and business transactions were not separated. Moreover, the financial audits (although classifying assets by corporation) assumed responsibility only for the

consolidated assets of both corporations. Under these circumstances, the treatment of both corporations as one business[2] utilizes fully the evidence adduced as to values and is in accord with equitable principles and fair play.

In his report the master, using appellees' figures as a basis, raised the valuation as to certain assets and eliminated some of the liabilities. The basic figures of $50,957.12 for the assets and $95,132.63 for the liabilities were changed to the figures of $69,325 and $57,244.81 respectively. Where appellees valued the Notes Receivable group and Real Estate Equities at $5,198.92 and $2,500 respectively, the master valued the same assets at $18,066.80 and $8000 respectively. As to the other assets the master did not deem it necessary to inquire into their value. Proceeding to the liabilities, concerning which there was conflict in the evidence, the master concluded to scale down the obligations in the following manner: he eliminated $9,250 as a lease obligation, on the ground that $4,625 was duplication and $4,625 improper; he disallowed $10,316.42 as expenses of the state receiverships; and he reduced the tax liability $18,321.40, on the theory that $12,-250 was duplicitous and $6071.40 represented excessive taxation on the part of the taxing body. In this fashion, the master deducted $37,887.82 from the appellees' figures, leaving the figure at $57,244.81.[3] According to these figures, the corporations are solvent by $12,080.19. In turn, the district court sustained the appellees' exceptions to the master's report and found the corporations insolvent.

The appellants contend that "the determination of the special master of controverted issues of fact, based upon the evidence of witnesses appearing in person before him, should not be set aside or modified by the court unless it is obvious that said determination is against the overwhelming weight of the evidence." We have given this contention serious consideration. We can not agree with it, but, even if we did, we can not see its applicability in the instant case.

▮ Recently, this court passed upon the latitude allowed the district court in overruling or rejecting the findings of the referee or master. It is proper to quote from this opinion, in which the court discussed at great length the very point here involved: "We do not think that it can be held that the District Court is bound by the 'substantial evidence' rule with regard to the findings made by the referee. While the rule [Rule 47 of the General Orders in Bankruptcy] makes the referee's finding presumptively correct, yet the court is vested with authority to 'reject the same in whole or in part when the court, in the exercise of its judgment, is fully satisfied that error has been committed.' * * * Of course, the judgment exercised by the court must not be arbitrary, but where there are facts and circumstances concerning which reasonable minds might differ, we think the court, after indulging in the presumption which the rule accords the referee's report, may exercise its judgment even though it be contrary to the finding as made by the referee." In re Duvall, 7 Cir., 103 F.2d 653, opinion announced April 28, 1939.

▮ In the instant case, the judgment of the district court in rejecting the master's report was not arbitrary. From an analysis of the facts as described above, and as will be shown in the discussion which follows, we believe that there are present in this particular situation "facts and circumstances concerning which reasonable minds might differ." In passing it might be added that this court, in the case of In re Duvall,

---

[2] This view makes unnecessary any discussion of appellants' contention that "the petitioning creditors did not have three bona fide creditors within the meaning of the Bankruptcy Act." In fact, counsel for appellants in the brief, concedes that "If the respondents (the corporate appellants) are to be considered as one corporation * * *, the three persons above named (Swanson, Johnson, and Morgan) constitute three creditors with provable claims against them * * *."

[3] The master's figure was set at $56,-563 instead of $57,244.81. It is obvious, however, that the master erred in his computations by $681.81 in some way.

Since we have approved of the master's treatment of both corporations as one business for the purpose of determining solvency, it follows that his elimination of $16,875 in the liabilities was proper on the ground of duplication. It is also clear that he correctly eliminated $10,-316.42 as expenses of the state receiverships. In the instant case, the task is to determine whether the corporations were insolvent at the time that they consented to the state receiverships. Liabilities incurred thereafter are immaterial in this regard.

supra, adequately disposed of In re Mendota Building Company, 7 Cir., 92 F.2d 644, relied upon by the appellants.

■ Assuming, however, that the appellants' contention has substance, we still would deny its applicability to the particular situation in question. The matter here does not depend wholly on the credibility of the witnesses, which is the basis of appellants' proposition. In the main, the essential facts concerning the liabilities were undisputed or clearly established. Yet, there stands a difference of $37,887.82 between the master's figures and the appellees' figures, arising solely out of a different application of legal principles. Thus, the master was not only the trier of controverted issues of fact but also the judge of important questions of law. It seems clear, even without the use of the guiding proposition stated in Re Duvall above, that where the conclusions of the master are not wholly based on conflicting testimony or credibility of witnesses, the district court is in a position equal to that of the master for arriving at conclusions.

■ We come, finally, to the consideration of the view of the district court which overruled the master's report and found the corporations insolvent. Although there will be less hesitancy in disturbing the findings of the district court, where the master and the district judge are not in accord, "we do not think we are at liberty to disturb the same except where we might conclude there was no substantial evidence or theory which would justify the court in reaching a conclusion contrary to that of the referee [master here]." In re Duvall, supra. After a careful consideration of the facts and circumstances, which are described adequately above, we are satisfied that the judgment of the district court is amply supported by the evidence and that appellees have sufficiently established the insolvency of the United Finance Corporation and the Money Corporation.

To determine whether a debtor is solvent under the balance sheet test adopted by the National Bankruptcy Act is often a difficult task. It is apparent, however, that the Act assumes ability of the debtor to pay his obligations in a reasonable period of time. Section 1(15) of the Act states the assets and liabilities test in the following way: "A person shall be deemed insolvent * * * whenever the aggregate of his property * . * * shall not, at a fair valuation, be sufficient in amount to pay his debts." 11 U.S.C.A. § 1(15).

This Section calls for a fair appraisal of the assets with a view to the probable debt-paying ability of the debtor.

■ In the instant case the problem reduces itself to giving values to assets of a personal loan business, which in truth has not been a prosperous going concern since 1924, but which at the time of the alleged acts of bankruptcy was not defunct. In the main, the asset appraisal here deals with undisputed claims against dilatory or financially irresponsible debtors. As to these claims of doubtful collectibility, the test is whether such a claim can be rendered available for payment of debts within a reasonable time, which in turn requires an analysis of the peculiar financial circumstances of the debtors themselves to see if they can fairly be expected to pay off their debts with reasonable promptness.

Keeping the above discussion in mind, we find ourselves unsatisfied with appellants' high valuation, which seems to be inconsistent with the assets and liabilities rule, and which does not allow for the failing condition of the debtors. The master was unable to accept their high values at all. Instead he appraised the assets close to the auditor's figures, giving more credence (if any at all) to the appellees' values than to the appellants' values. On the other hand, appellees' value evidence is consistent with the theory that a fair value is a value that can promptly be made effective by the owner of property to pay his debts without resorting to sacrifice prices resulting from execution or foreclosure sales.

In the instant case, the business did not give promise of doing fairly well in the future. In fact, it was so unprosperous that immediate liquidation in the interests of the creditors seemed more desirable than a continuation of the business. There was nothing substantial upon which the debtors could rely. The remaining assets were old accounts and claims of doubtful collectibility, and, as Pearce aptly stated it, looked like the "tail end of a business that had been slipping for many years." Our analysis of the facts and circumstances bears out that the corporations were insolvent at the time when they consented to state receiverships, i. e., by July 12, 1937. It follows that there was "substantial evidence" which did "justify the court in reaching a con-

clusion contrary to that of the referee (master here)."

Appellants relied heavily on the master's report, which shows a solvency margin of $12,080.19. A study of the master's report reveals many interesting things. It is apparent that the master, as far as asset values go, did not rely on the evidence of either side. The unusually high values of appellants did not appeal to him, and appellees' valuation of $50,957.12 was "altogether too conservative." Instead he found $69,325.00 as the fair value of the assets, only $321.97 long of being midway between the appellees' figure and the auditor's figure. In this connection, it is pertinent to note that usually audits are merely statements of cost, discounted to a certain degree to allow for the failing condition of the debtor, and that a hard-headed business man, if he were making a commercial valuation, would write down the assets far below the cost. The circumstances surrounding these unprosperous loan corporations—their long history of financial losses, their present inability to meet ordinary demands of creditors, the sad condition of their assets (all of doubtful collectibility, except the small amount of cash) —strongly suggest that appellees' asset valuation was not "altogether too conservative" and that the master's report was not in accord with the evidence.

Before passing on, it is appropriate to consider the master's action in dealing with the liabilities. On this side of the balance sheet, the evidence was undisputed, and the application of legal principles was of prime importance. In this instance, the master subtracted $37,887.82 from the appellees' figure of $95,132.63. In general, this reduction was necessary to eliminate duplication resulting from the treatment of the two corporations as one business. But, in any event, we believe, and the discussion shows, that the master deducted $10,696.40 too much. Assuming that the master was correct in his asset valuation, this erroneous reduction in itself would practically consume the master's solvency margin of $12,080.19.

Appellees' evidence showed a total tax liability of $14,571.40, based on an income tax deficiency finding of the Commissioner of Internal Revenue. Appellants introduced the opinion evidence of their tax counsel, who had been unsuccessful in contesting the tax at the hearing before the Commissioner. Appellants' tax counsel testified that in his opinion the maximum tax liability was $3,198.94 plus interest and attorney fees. On this evidence the master stated it was his opinion the tax liability could be settled for $8,500 and he set the liability at that sum, thereby scaling down the liability by $6,071.40. The determination of the Commissioner of Internal Revenue as evidence of a tax liability is to us more convincing than the opinion of a taxpayer's unsuccessful tax counsel, and we believe that on this point the district court was clearly in an equal position with the master.

The master excluded, and the district court included, a liability based on unpaid rent in the amount of $4,625. Counsel on both sides on this appeal rely on Levy v. Greenberg, 261 Ill.App. 541. As we understand the situation, the lease called for $2,000 rental per month. In a 77B reorganization of the lessor corporation, the district court made an order reducing the rental to $1400 a month, on condition that the rentals were to be guaranteed by the Money Corporation. The guaranty was never given, the lessor continued to bill at $2,000 a month, and the lessee paid only $1,400 a month. The unpaid rental, the difference between $2,000 and $1,400 for almost eight months, presents the problem here. We have given the Levy case much consideration, and we have come to the conclusion that it does not support appellants' contention.

Instead of an oral agreement without consideration, the periodical execution of which completed an irrevocable gift (the theory of the Levy case), we have here an order of the court in the reorganization proceedings reducing the rental on an express condition which was never performed. If the order is held tantamount to an agreement between lessee and lessor, it would be a written agreement made with an express guaranty condition or limitation. The Illinois rule that allows an oral or written agreement, nudum pactum, to vary an instrument under seal is premised on the proposition that otherwise the intention of the parties would be defeated. Snow v. Griesheimer, 220 Ill. 106, 77 N.E. 110. In our case, to hold with appellants is in effect to defeat the intention of the parties, the very basis of the exception to the general doctrine that an instrument under seal can not be varied by an oral agreement made

without consideration. Goldsborough **v.** Gable, 140 Ill. 269, 29 N.E. 722, 15 L.R.A. 294.

 Moreover, in Levy v. Greenberg, supra, in its opinion 261 Ill.App. at page 546, the court recognizes that the subsequent oral agreement must be made without limitation: "It was manifestly the clear intention of the parties that the rental should be reduced from $135 a month to $110 a month, and the stipulated facts indicate that this oral agreement was made without limitation, and the lesser sums accepted by plaintiff without any receipt or release indicating a limitation thereon."

Here the guaranty provision was either intended by the parties to be consideration for the reduced rental or a limitation on the agreement to reduce the rental. Under such circumstances, liability exists for the unpaid rental, and the master was in error. These considerations and others mentioned throughout the discussions described above satisfy us that the district court was right in overruling the master's report and that its finding of insolvency is supported by substantial evidence.

 Although proof of inability to pay debts in the ordinary course of business, failing circumstances, unsatisfied judgments, and a host of miscellaneous circumstances are insufficient alone to justify a finding of insolvency, In re Soudan Mfg. Co., 7 Cir., 113 F. 804, 808; Chicago Motor Vehicle Co. v. American Oak Leather Co., 7 Cir., 141 F. 518, 521; Butler Paper Co. v. Goembel, 7 Cir., 143 F. 295, 297; In re Billy's Ice Cream Co., 7 Cir., 295 F. 502, 503, they are strongly suggestive of, and often accompany, an insufficiency of assets. Where, as here, these heavy circumstances are coupled with and support direct convincing evidence that a fair value of all the assets is insufficient to pay off the liabilities, there is nothing more that can be said. Under the evidence established by appellees, the corporations cannot fairly be expected to pay off their debts within a reasonable period of time.

 Appellants also contend that "If the corporations were solvent on the dates of the commission of the alleged acts of bankruptcy, said acts did not constitute acts of bankruptcy. There is no evidence in this record as to the insolvency of either of said corporations on said dates." We affirm this contention inasmuch as it states the applicable rule of law. We disagree, however, that there is no evidence of insolvency at the time of the state receiverships. The pleadings allege insolvency at the time that the corporations consented to and went into state receiverships. The evidence adduced by both sides either affirmed or disaffirmed insolvency as of the date in question. The master and the district court weighed the evidence with this date in mind. We find that the evidence is not at variance with the pleadings.

 The United Finance Corporation and the Money Corporation consented to state receiverships on July 10 and July 12 of 1937 respectively. On those two dates the law required equality between assets and liabilities. Evidence by appellees sufficiently establishes that the corporations could not meet that requirement. The order of the district court is therefore affirmed.

