**SYRACUSE ENGINEERING CO., Inc.,
et al. v. HAIGHT.
No. 230.**

Circuit Court of Appeals, Second Circuit.
March 4, 1940.

Stewart F. Hancock, of Syracuse, N.Y. (Morris Berman and Lionel O. Grossman, both of Syracuse, N. Y., on the brief), for petitioning creditors-appellees.

George R. Fearon, of Syracuse, N. Y. (Keith F. Driscoll and Costello, Cooney & Fearon, all of Syracuse, N. Y., on the brief), for objecting creditor-appellant.

Gerald H. Henley, of Syracuse, N. Y. (Hiscock, Cowie, Bruce & Lee and A. J. & A. P. Oot, all of Syracuse, N. Y., on the brief), for intervening creditors-appellees.

Before SWAN, CLARK, and PATTERSON, Circuit Judges.

CLARK, Circuit Judge.

The appellant herein, a creditor having a judgment lien against Julian S. Brown, appeals from Brown's adjudication as an involuntary bankrupt on the grounds (1) that there were not three petitioning creditors with provable claims and (2) that the alleged bankrupt was not insolvent.

The creditors of Julian S. Brown have been fighting over his considerable estate for nine years. Brown himself is not disposed to help them; with an annual income in excess of $20,000 under a trust, their efforts to tie up his other assets have not proven too embarrassing to him. An attempt of one creditor group to set up a receivership for Brown proved abortive. He was then placed in involuntary bankruptcy, but the petition was dismissed and we affirmed. In re Brown, 2 Cir., 87 F.2d 306. A second involuntary petition resulted in an adjudication. We vacated that ruling for errors below, and remanded the proceedings for a new hearing. Syracuse Engineering Co., Inc. v. Haight, 2 Cir., 97 F.2d 573. It is from the adjudication made after the new hearing that this appeal is taken.

The questions now before us resolve themselves in the main into problems of valuing assets and liabilities, i. e., decisions of fact made on sharply disputed testimony produced at an extensive trial. There is no reason to believe that we can reach any sounder results than did the district judge who was familiar with this estate from long association with it, as well as with the local conditions in and around Syracuse, where the physical assets are located. That an objecting creditor can so long prevent administration of an estate while he endeavors to preserve his priority perhaps indicates the wisdom of the change made in the bankruptcy statute by the Chandler Act in omitting creditors from those who may plead in answer to an involuntary petition. Section 18, sub. b, 11 U.S.C.A. § 41, sub. b. These long drawn out proceedings have engendered hard feeling among counsel, leading to unsupported charges of bad faith in the briefs wholly out of place in appellate argument.

First, however, we must note appellant's claim that two of the three original petitioners did not have provable claims as required by § 59, sub. b, 11 U.S.C.A. § 95, sub. b. The District Court supported one of these claims on disputed testimony; while the other, asserted to be barred by the statute of limitations, was not so barred when the petition was filed. But their status becomes academic here, since between the last appeal to this court and the new hearing below, two additional creditors with unquestionably valid claims have been allowed to intervene and join in the petition. Creditors who intervene before adjudication may be counted in determining whether the necessary three petitioning creditors exist. Canute S. S. Co. v. Pittsburgh & West Virginia Coal Co., 263 U.S. 244, 44 S.Ct. 67, 68 L.Ed. 287. Appellant's only reply is that the requests to intervene should never have been granted. It would appear that under § 59, sub. f, intervention to join in an involuntary petition is a matter of right, Canute S. S. Co. v. Pittsburgh & West Virginia Coal Co., supra; Guterman v. C. D. Parker & Co., 1 Cir., 86 F.2d 546, certiorari denied, 300 U.S. 677, 57 S. Ct. 670, 81 L.Ed. 882, though compare In re Brown, supra, 87 F.2d at page 308. Even if the granting of leave to intervene is discretionary, we have said that we will not upset the ruling of the District Court except for clear cause shown. In re Tidewater Coal Exchange, 2 Cir., 280 F. 638, certiorari denied, Delaware S. S. Co. v. New England Coal & Coke Co., 259 U.S. 584, 42 S.Ct. 587, 66 L.Ed. 1075. No satisfactory reason has been presented why intervention should not have been allowed here.

We turn next to the issue of Brown's solvency. The alleged act of bankruptcy is that Brown, while insolvent, per-

mitted the present objecting creditor, Haight, to obtain a lien against his property by judicial proceedings—the lien which Haight is here trying to preserve—and failed to discharge it within thirty days thereafter. Bankruptcy Act, § 3, sub. a (3), 11 U.S.C.A. § 21, sub. a (3). Since Brown consented to examination, the burden of proving insolvency, as we ruled before, rests on the petitioning creditors. Syracuse Engineering Co. v. Haight, 2 Cir., 97 F.2d 573, 575. Whether the burden would fall on the objecting creditor if Brown had refused to undergo examination, we declined to decide on the last appeal, and we decline again. In any event, we think petitioners have this time sustained their burden.

The parties are apart to the extent of almost $900,000 in their claims as to the values in this estate. Petitioners assert assets of a trifle over $116,000, and liabilities of $388,000. The objecting creditor appraises assets at about $800,000, and liabilities at $183,452. The trial court took a middle course, with a finding of $204,000 in assets, and $319,000 in liabilities. To overrule the district judge, we must therefore find aggregate error (and in one direction only) of $115,000 in his valuations.

*Liabilities.* The largest single liability is the judgment of $131,641.97 in favor of the objecting creditor. We need consider only three other items; the validity of all the rest cannot be seriously questioned. These three are claims asserted against Brown for deficiencies under mortgages on which he was personally obligated. The mortgage debt owed to the Thalheimer estate was $123,000. Under N. Y. Civil Practice Act, § 1083-a, a deficiency judgment could be taken only for this sum less the fair market value of the property. A witness for petitioning creditors appraised fair market value at $65,000; appellant claims a value up to $180,000. The District Court arrived at a figure of $73,000, and placed Brown's deficiency liability at $50,000.

Two other deficiency claims are asserted by the First Trust & Deposit Co., which holds the Pack and Schumacher mortgages. The court found the claim against Brown on the Pack mortgage to be at least $5,000. Evidence for the petitioning creditors showed that the correct sum might even be $9,000. The Schumacher mortgage was a second mortgage, and the previous foreclosure of the senior mortgage had left no surplus. Brown was surety on the second mortgage, but his principal had no assets.

Consequently the District Court found Brown liable for the full mortgage debt of $67,500.

We shall not reverse any of these findings. The evidence was sharply conflicting; nothing in the record persuades us that the court's estimates were erroneous. Certainly they were not "clearly erroneous," as they must be to justify reversal. Federal Rule of Civil Procedure 52 (a), 28 U.S.C.A. following section 723c; cf. In re Connecticut Co., 2 Cir., 107 F.2d 734; In re United Finance Corp., 7 Cir., 104 F.2d 593, 598.

*Assets.* Except for the trust fund to be discussed below, most of the assets of Julian S. Brown were parcels of real estate in the City of Syracuse. What we have said above applies equally to the District Court's appraisals of these properties. We accept its figure of $154,000 for all assets exclusive of the trust fund.

The principal dispute now, as on the former appeal, concerns the trust fund created by Julian S. Brown's mother for the benefit of Julian and his brother and valued at more than $1,000,000. By the terms of the will creating the trust, each brother receives one-half the income until he reaches the age of 60, at which time he receives one-half the principal; but if one brother dies before becoming 60, the entire principal goes to the other upon attaining that age. No provision is made for the contingency that both die before 60; but it is agreed that the principal will then pass in equal parts to the estates of the two brothers as sole distributees. At the time of the adjudication Julian S. Brown was 49 and his brother was 51. The expectancy that a man of 49 will live for 10 years is about 84 per cent by the American Mortality Tables. Both Julian's interest in the principal and his interest in the income must be considered in determining the value of his property. Syracuse Engineering Co. v. Haight, 2 Cir., 97 F.2d 573, 576.

*The principal.* Both sides offered expert testimony to show a market for the purchase of vested and contingent remainders and as to the fair price that Julian S. Brown's remainder would bring. Appellant's witness Martindell gave such price as $200,000 if no insurance could be secured on Brown's life by the purchaser. Under the same conditions, Rosenberg, the witness for petitioning creditors, would hazard no more than $20,000. A bank officer

also testified that banks would loan nothing on such an interest. Rosenberg's testimony was far more credible than Martindell's. He had been a decade in the business, while Martindell was an adviser who had engaged only in occasional adventures. Without insurance, the purchase of the remainder would not be an investment, but a gamble. According to Rosenberg, a $500,000 vested remainder subject to no contingency whatsoever but the lapse of time could be purchased for less than the sum at which Martindell appraised Brown's contingent interest. The District Court allowed a "speculative or gambling value" to Brown's interest of not over $50,000.

Much is made of the possibility of avoiding the speculative nature of the investment by insurance. It clearly appeared, however, that Brown would not consent to insurance. He did not believe in insurance—perhaps naturally under the circumstances. He had none himself. Without Brown's signature on the application, a purchaser of the interest could not procure insurance on his life in New York. Insurance Law (Consol. Laws, c. 28) § 55. Furthermore, it would be necessary that Brown take a physical examination and be accepted as a proper risk by an insurance company. Lloyd's of London was said to be a possibility, but it was not licensed to act in New York and no evidence was offered of its willingness to accept such risks. A scheme of self-insurance by the purchaser such as proposed by Martindell is not insurance at all. It would not shift a penny of the risk.

Nevertheless, appellant argues that in valuing the interest Brown's assistance in obtaining insurance must be assumed. Even on this assumption valuation is not clear, and it still may be doubtful that the value of the asset is then increased so far above $50,000 as to offset the additional margin of $115,000 allowable in the District Court's figures before the adjudication becomes erroneous. A heavy charge must be incurred for insurance before adequate protection is secured. According to the testimony, insurance on Brown's life would cost $30 per thousand. To determine his actual investment a purchaser would have to add loss of interest, necessary attorney's fees, and the cost of insurance to his orig-

inal payment; unless he protected himself on these items, he would be out of pocket on the unsuccessful termination of his venture.[1] And if he won, the income tax gatherer would be at hand to reduce his gains sadly. In view of these uncertainties, we might well hesitate to overthrow the District Court's conclusion in any event.

■ We do not believe, however, that this asset should be valued on the assumption that insurance is obtainable. Here involved are some fundamental conceptions of the role of valuation in determining insolvency. Under "the balance sheet test" of the Bankruptcy Act, § 1 (15), now (19), 11 U.S.C.A. § 1 (15), now (19) (In re United Finance Corp., supra, 104 F.2d at page 598), insolvency results when the "aggregate" of a debtor's property is not sufficient "at a fair valuation" to pay his debts. Fair valuation of an estate such as this might conceivably be based on forced sale prices, or on fair market prices, or on so-called intrinsic values, irrespective of sale. A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard. Bonbright and Pickett, Valuation to Determine Solvency under the Bankruptcy Act, 29 Col.L.Rev. 582, 597, 598; 1 Collier on Bankruptcy (14th Ed. 1940) 74–81, collecting cases. It involves a value that can be made available for payment of debts within a reasonable period of time. In re United Finance Corp., supra; Babbitt v. Read, 2 Cir., 236 F. 42, 47, certiorari denied 243 U.S. 648, 37 S.Ct. 475, 61 L.Ed. 946; Stern v. Paper, D.C.N. D., 183 F. 228, 230, 231, affirmed 8 Cir., 198 F. 642. And fair market value implies not only a "willing buyer," but a "willing seller." Grandison v. National Bank of Commerce, 2 Cir., 231 F. 800, 804, certiorari denied 242 U.S. 644, 37 S.Ct. 213, 61 L.Ed. 542; Irving Trust Co. v. Manufacturers' Trust Co., D.C.S.D.N.Y., 6 F.Supp. 185; Collier, supra at 77.

The "willing seller" could be either Brown or his trustee in bankruptcy. Whatever might be the fair market value of this interest with Brown agreeing to take out insurance, Brown's refusal presents a different situation. We do not believe that

---

[1] Appellees assert that on an original purchase price of $200,000, and with insurance to return only that amount, a purchaser would have additional expenses of $137,000 by the end of ten years— $66,000 for loss of interest at 3 per cent; $5,000 for administration expenses and attorney's fees; and $66,000 for insurance premiums.

the concept of fair market value requires us to conceive of a willing seller as one able and willing to take out insurance when we know that no such person exists. Hence we cannot say that the District Court's valuation of this interest is clearly erroneous.

■ *The income.* The income from the trust fund has averaged roughly $22,000 a year. Appellant concedes that Brown needs a minimum of $7,000 for living expenses, but it is claimed that the $15,000 surplus must be included as one of Brown's assets. An absolute right to receive $15,000 a year for a period of years has a substantial present value; if it be computed at 4 per cent for eleven years it would be at least $131,000. But Brown's right to income could not be sold for any figure approaching this sum. As before, the risk that Brown might die must be offset by insurance to attract a purchaser, and Brown will have none of insurance. Even if we disregard the risk of death and Brown's refusal to insure, this right to income has little or no market value. A voluntary assignment by Brown would not be enforceable against the trustee of his mother's estate. N. Y. Personal Property Law (Consol. Laws, c. 41) § 15 (1); cf. Real Property Law (Consol. Laws, c. 50) § 103; Judis v. Martin, 218 App.Div. 402, 218 N.Y.S. 423, appeal dismissed 244 N.Y. 605, 155 N.E. 916; Matter of Ungrich, 201 N.Y. 415, 94 N.E. 999. Brown as a willing seller could hardly find a willing buyer, for no sensible buyer would pay for a right good against Brown alone. And if we consider the trustee in bankruptcy as the willing seller, additional difficulties arise. A judgment creditor, by appropriate equitable proceedings, may secure 10 per cent of Brown's income under N. Y. Civil Practice Act, § 684, plus whatever surplus exists above Brown's suitable living expenses under Real Property Law, § 98; and the bankruptcy trustee should have like rights. See In re Morris, 2 Cir., 204 F. 770; Jenks v. Title Guarantee & Trust Co.,

170 App.Div. 830, 156 N.Y.S. 478. But just what the bankruptcy trustee can actually sell and transfer, if anything, is not clear; it has been held that he cannot make an assignment giving the right of garnishee execution. Matter of Towne, 278 N.Y. 597, 16 N.E.2d 117, affirming 253 App.Div. 795, 1 N.Y.S.2d 1016. And we could hardly require a bankruptcy administration of eleven years while the trustee collected the income himself.

Appellant would have us overcome all these difficulties by the simple expedient of resort to the rule that property exempt from attachment and execution must nevertheless be computed as a part of the defendant's assets under Bankruptcy Act, § 1 (15), now (19), 11 U.S.C.A. § 1 (15), now (19); Lasswell v. Stein-Block Co., 5 Cir., 93 F.2d 322; Bonbright and Pickett, supra at page 590; Collier, supra at 71, 72. Appellant admits that Brown needs $7,000 a year for suitable living expenses; this sum is the maximum we can consider exempt, in view of N. Y. Real Property Law, § 98. Should we concede that exempt property be included in our valuation, we must appraise the value of Brown's right to receive $7,000 annually for eleven years. But we have already concluded that Brown's right to receive $22,000 for eleven years has no present market value, and the same must be said of his right to receive the exempt portion of that sum. As we have ruled above, valuation for purposes of straight bankruptcy contemplates sale for payment of debts within a reasonable period of time. Neither the accessible nor the exempt portion of Brown's right to receive income has any sale value of substance.

Being thus unwilling to substitute our uncertain guess for the findings of the District Court on these items of doubtful and disputed value, particularly in the light of the substantial margin of insolvency thus disclosed, we hold that the adjudication of bankruptcy must be affirmed.